STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JAMES E. WILLIAMS, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JAMES J. KOEDATICH, DEFENDANT-APPELLANT.

Argued February 23, 1983—Decided April 26, 1983.

40

44

*M. Virginia Barta,* Assistant Deputy Public Defender, argued the cause for appellant James E. Williams (*Joseph H. Rodriguez,* Public Defender, attorney; *Theodore V. Fishman,* Deputy Public Defender and *J. Stewart Husid,* First Assistant Deputy Public Defender, of counsel; *M. Virginia Barta* and *Matthew Astore,* Assistant Deputy Public Defender, on the brief).

*Howard F. Cerny,* a member of the New York bar, argued the cause for appellant James J. Koedatich (*John C. Tarantino,* attorney).

*Irwin I. Kimmelman,* Attorney General of New Jersey, argued the cause for respondent (*Philip S. Carchman,* Mercer County Prosecutor (*State v. Williams* ), and *Howard A. McGinn,* Warren County Prosecutor (*State v. Koedatich* ), attorneys; *Debra L. Stone,* Deputy Attorney General, and *Kathryn Flicker,* First Assistant, Mercer County Prosecutor, of counsel; *Debra L. Stone,* on the brief).

*Thomas J. Cafferty* argued the cause for *amicus curiae* New Jersey Press Association (*Seiffert, Frisch, McGimpsey and Cafferty,* attorneys; *Thomas J. Cafferty* and *A.F. McGimpsey, Jr.,* on the brief).

*Frances Goldmark* argued the cause for *amicus curiae* The Trenton Times Corporation (*Jamieson, McCardell, Moore, Peskin & Spicer,* attorneys; *Frances Goldmark, Richard D. Martinson* and *Andrew J. Shedlock, III,* on the brief).

*Edward F. Lamb* argued the cause for intervenor Newark Morning Ledger Company, Publisher of the Star-Ledger (*Robinson, Wayne, Levin, Riccio & La Sala,* attorneys; *Peter C. Gould,* a member of the New York bar, of counsel; *Edward F. Lamb, Donald A. Robinson* and *Joseph F. Lagrotteria,* on the brief).

*Frederick L. Whitmer* argued the cause for intervenors The New York Times Co. and CBS Inc. (*Pitney, Hardin, Kipp & Szuch,* attorneys; *George Freeman* and *Allen Y. Shaklan,* members of the New York bar, of counsel; *Frederick L. Whitmer, Peter A. Scarpato* and *Peter M. Laughlin,* on the brief).

*Gerald A. Hughes* submitted a brief on behalf of *amicus curiae* Capitol City Publishing Company, Inc. t/a The Trentonian.

*Martin Klughaupt* submitted a letter brief on behalf of intervenors The Herald-News and The Daily Advance.

*Aron M. Schwartz* submitted a brief on behalf of intervenors Morristown Daily Record, Inc. and Easton Publishing Company (*Vogel and Chait,* attorneys; *Aron M. Schwartz* and *Lorraine C. Staples,* on the brief).

The opinion of the Court was delivered by

HANDLER, J.

These cases pose the question of whether and under what circumstances pretrial proceedings in a criminal prosecution can be closed to the public and the press. In each of these cases, the defendant has been charged with murder under the New Jersey Code of Criminal Justice and faces the death penalty. Defendants claim that the public and the press should be excluded from certain of their pretrial proceedings, specifically a probable cause hearing and bail applications. Defendants assert that the adverse publicity generated by the conduct of these pretrial proceedings in open court will prejudice their constitutional rights to a fair trial before an impartial jury.

This Court has never fully considered the permissibility of the closure of pretrial proceedings in a criminal prosecution. In *State v. Obstein,* 52 *N.J.* 516 (1968), the Court directed, without extended discussion, that a bail hearing in a capital case be held *in camera* to safeguard against "possible prejudice" of defendant's plenary trial through public circulation of "obviously incomplete but necessarily incriminating evidence." *Id.* at 522. However, major developments have occurred in the law regarding public access to court proceedings since our *Obstein* decision, including several United States Supreme Court decisions that have addressed the constitutionality of the closure of criminal proceedings. *Globe Newspaper Co. v. Superior Court,* —— *U.S.*

——, 102 *S.Ct.* 2613, 73 *L.Ed.2d* 248 (1982); *Richmond Newspapers, Inc. v. Virginia,* 448 *U.S.* 555, 100 *S.Ct.* 2814, 65 *L.Ed.2d* 973 (1980); *Gannett Co., Inc. v. DePasquale,* 443 *U.S.* 368, 99 *S.Ct.* 2898, 61 *L.Ed.2d* 608 (1979); *see also Nebraska Press Ass'n v. Stuart,* 427 *U.S.* 539, 96 *S.Ct.* 2791, 49 *L.Ed.2d* 683 (1976). This Court also dealt with this subject in *State v. Allen,* 73 *N.J.* 132 (1977). These developments prompt our reconsideration of the standards for determining whether criminal pretrial proceedings can be closed in order to overcome prejudicial publicity.

We now determine that the public and the press have a protectible constitutional interest in access to all pretrial proceedings in the prosecution of a criminal case. This constitutional interest is based upon both the federal and State constitutions and must be given appropriate weight when counterbalanced with a defendant's constitutional right to a trial before an impartial jury. Accordingly, we hold that all pretrial proceedings in criminal prosecutions shall be open to the public and the press. In the context of these cases, the only exception to this general rule will arise in those instances in which the trial court is clearly satisfied that as a result of adverse pretrial publicity, a realistic likelihood exists that a defendant will be unable to secure a fair trial before an impartial jury if the pretrial proceeding is conducted in open court.

I

In *State v. Williams,* the defendant, James Williams, was arrested on January 2, 1983 and charged with purposely and knowingly causing the death of Beverly Mitchell. *N.J.S.A.* 2C:11–2(a). Three days earlier, the victim had been found slain at the Bellevue Care Center in Trenton, Mercer County, where she had been employed. She had been stabbed repeatedly and was the probable victim of a sexual assault.

The Public Defender who represented Williams requested a bail hearing and subsequently moved that it be held *in camera.* Defendant contended that massive adverse pretrial publicity, including that which would be generated by an open bail hear-

ing, would deprive him of a fair trial before an impartial jury. At a hearing on the matter, the trial court granted the request of two local newspapers, the *Trenton Times* and *The Trentonian,* to be heard as *amicus curiae,* and after argument, denied defendant's motion to close the hearing. The court's oral ruling recognized the concern for selecting an impartial jury, but rejected the need for closure "because in the experience that I have had over a number of years in picking juries in cases, it appears that no matter how much publicity is involved, there are still individuals that are ready and available for a jury."

The defendant then sought emergent relief for leave to appeal to the Appellate Division. On this application, defendant filed affidavits containing samples of the newspaper publicity concerning the case.[1] The defendant's motion for leave to appeal was denied. Defendant's counsel immediately filed with this Court a motion for emergent relief seeking an *in camera* bail hearing. A stay of the bail hearing was issued on an emergency basis to permit the entire Court's consideration of the matter. The full Court then granted defendant's motion for leave to appeal and vacated the emergency stay. The Court entered an *interim* order remanding the matter to the trial court for the limited purpose of conducting a bail hearing *in camera* and required the impoundment of the transcript of such proceeding. The bail hearing was conducted *in camera* and the trial court

---

[1]The publicity submitted contains largely factual reports of the events surrounding Ms. Mitchell's death and Williams' arrest and bail hearing. The articles, almost exclusively from the *Trenton Times* and *The Trentonian,* discuss the circumstances of the killing, detail the evidence implicating Williams in the crime and report upon the legal proceedings that followed Williams' arrest. Press coverage also included a front-page *Trenton Times* article with the headline "Suspect killed his brother" reporting the accidental killing of Williams' brother when Williams was nine years old.

Although defendant did not introduce this evidence of press coverage at the trial level, it appeared that everyone, including the judge, was aware of the nature of the publicity. The trial court, perhaps anticipating further proceedings raising the closure issue, ruled that defendant could continue to supplement the record with evidence of adverse publicity.

ordered that Williams continue to be held without bail. The transcript of the bail hearing remains impounded.

In *State v. Koedatich,* the defendant, James Koedatich, was arrested on January 18, 1983 and charged with the murder of Deidre O'Brien. *N.J.S.A.* 2C:11–2(a). The victim had been abducted while driving to her parents' home in Morris County on December 5, 1982 and was stabbed to death. Koedatich's bail was set at $250,000.

Defendant moved to exclude the media and the public from his upcoming probable cause hearing, contending that extensive pretrial publicity would prevent his having a fair trial. Several media organizations were granted leave to intervene in proceedings on the motion. After oral argument the trial court denied defendant's motion, relying principally on the case of *State v. Joyce,* 160 *N.J.Super.* 419 (Law Div.1978), aff'd *sub nom. State v. DeBellis,* 174 *N.J.Super.* 195 (App.Div.1980). The court initially found that defendant failed to demonstrate that public access to the proceedings would constitute a serious and imminent threat to the integrity of the trial. Although the court recognized the extensive press coverage of the case in the New York and northern New Jersey metropolitan area, it held that defendant had failed to provide any factual basis to support a substantial probability of prejudice in Warren County, where the case will be tried and which is "somewhat removed from the center of pretrial publicity." [2] The court also found that defendant had failed to meet his burden to prove that a fair trial could not be ensured by other alternatives, such as temporary adjourn-

---

[2]The publicity included in the record in the Koedatich case was generated primarily in early December following Ms. O'Brien's stabbing death and again in January following Koedatich's arrest. During these periods, almost-daily reports were published by several newspapers including the Morristown *Daily Record,* the *Easton* (Pennsylvania) *Express* and the *Star-Ledger* (Morris, Sussex, Warren edition). Other newspapers, including the Dover *Daily Advance,* the Bridgewater *Courier-News,* the *Passaic Herald News* and the *New York Daily News,* provided less frequent coverage. The December articles chronicled in detail the circumstances surrounding the killing, the statewide manhunt and extensive investigation that ensued and the resulting fear and

ment of the trial, change of venue, a foreign jury, searching voir
dire and emphatic and clear jury instructions.

Defendant made an application to the Appellate Division for
emergent relief to grant his motion for leave to appeal. Prior to
a decision by the Appellate Division, this Court directly certified
the matter pursuant to *R.* 2:12–1 and granted the motion for
leave to appeal. Koedatich subsequently moved before this
Court that his pending bail reduction hearing also be closed.
The Court issued an *interim* order granting defendant's motion
for closure. Both the bail reduction hearing and the probable
cause hearing have since been held *in camera;* bail was not
reduced and probable cause was found. The transcripts of these
proceedings have not been released to the public.

## II

The initial issue presented by these cases is whether the public
and the press have a constitutional right of access to pretrial
proceedings in criminal cases. On this fundamental issue, we
perceive a confluence of the federal and State constitutions in
terms of substantive concerns and interpretive philosophy.
These shared constitutional views bring us to the conclusion that
a public right of access to pretrial proceedings in criminal cases
is embraced by both constitutions.

Although the United States Supreme Court has never directly
determined that the First Amendment creates a right of the

---

anxiety felt by many area residents. These articles postulated a possible
relation between the O'Brien murder and several other unsolved murders in
the area. Koedatich's arrest in January was announced by banner, front page
headlines. Published articles extensively reported Koedatich's background
and personal history including his prior criminal involvement. In particular,
the papers noted that Koedatich had just completed an 11-year prison term in
Florida where he was serving a 20-year sentence for murder and armed
robbery. Moreover, reports indicated that while in jail Koedatich had choked
to death another inmate, although the incident was considered justifiable
homicide. Coverage of subsequent legal developments in Koedatich's case
reiterated the facts surrounding Ms. O'Brien's stabbing death and Koedatich's
criminal history.

public and the press to attend criminal pretrial proceedings,[3] it has declared that the First Amendment commands that criminal trials be held in open court. *Richmond Newspapers, supra; Globe Newspaper, supra.* It has recognized that the underlying function of the First Amendment is to "ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government," and that the right of access to criminal trials is protected by the First Amendment because open trials serve to guarantee that the " 'discussion of governmental affairs' is an informed one." *Id.* at ——, 102 *S.Ct.* at 2619, 73 *L.Ed.*2d at 255–56 (quoting *Mills v. Alabama,* 384 *U.S.* 214, 218, 86 *S.Ct.* 1434, 1437, 16 *L.Ed.*2d 484, 488 (1966)).[4]

---

[3]In *Gannett Co., Inc. v. De Pasquale,* 443 *U.S.* 368, 99 *S.Ct.* 2898, 61 *L.Ed.*2d 608 (1979), the Supreme Court reviewed the closure of a pretrial suppression hearing in a murder prosecution. Only Justice Powell, in a concurring opinion, examined the First Amendment as a possible source of a right of access to pretrial proceedings. He determined that the public and the press had a constitutional interest in being present at the pretrial suppression hearing. *Id.* at 397, 99 *S.Ct.* at 2914, 61 *L.Ed.*2d at 632. The other Justices expressly refrained from deciding the issue and instead considered only whether the Sixth Amendment encompassed a right of public access to pretrial proceedings. *Id.* at 392, 99 *S.Ct.* at 2912, 61 *L.Ed.*2d at 629 (opinion of the Court); *id.* at 447, 99 *S.Ct.* at 2940, 61 *L.Ed.*2d at 664 (Blackmun, J., concurring in part and dissenting in part).

[4]Justice Brennan, in his concurring opinion in *Richmond Newspapers, supra,* emphasized the "*structural* role [of the First Amendment] in securing and fostering our republican system of self-government." 448 *U.S.* at 587, 100 *S.Ct.* at 2833, 65 *L.Ed.*2d at 996. The central function of the First Amendment according to this structural analysis is to insure an informed and robust public debate. *Ibid.* This conception of the First Amendment is "theoretically endless," *id.* at 588, 100 *S.Ct.* at 2833, 65 *L.Ed.*2d at 997, because most information in the possession of government can arguably help inform the public debate. Therefore, in order to invoke this protection "with discrimination and temperance," *ibid.,* Justice Brennan noted that the "right of access has special force when drawn from an enduring and vital tradition of public entree" and when "access to a particular government process is important in terms of that very process." *Id.* at 589, 100 *S.Ct.* at 2834, 65 *L.Ed.*2d at 997.

In *Globe Newspaper, supra,* the Supreme Court anchored its analysis upon "the *institutional value* of the open criminal trial [which] is recognized in both logic and experience." *Id.* at ——, 102 *S.Ct.* at 2620, 73 *L.Ed.*2d at 257 (emphasis added). It first stressed the historic and current practice of holding criminal trials in open court. "This uniform rule of openness has been viewed as significant in constitutional terms not only 'because the Constitution carries the gloss of history,' but also because 'a tradition of accessibility implies the favorable judgment of experience.'" *Id.* at ——, 102 *S.Ct.* at 2619, 73 *L.Ed.*2d at 256 (quoting *Richmond Newspapers, supra,* 448 *U.S.* at 589, 100 *S.Ct.* at 2834, 65 *L.Ed.*2d at 997 (Brennan, J., concurring in the judgment)). The Court also emphasized the "particularly significant role" played by open criminal trials "in the functioning of the judicial process and the government as a whole," observing that

> [p]ublic scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole. Moreover, public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process. And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government. [—— *U.S.* at ——, 102 *S.Ct.* at 2620, 73 *L.Ed.*2d at 256–57 (footnotes omitted) ]

■ The question posed by the present appeals is whether this analysis of the "institutional value" of open criminal trials applies with equal force to criminal pretrial proceedings. We believe that it does and conclude therefore that the First Amendment embraces a public right of access to such pretrial proceedings.

The pretrial aspects of criminal prosecutions have become increasingly important in the modern administration of criminal justice. *See Coleman v. Alabama,* 399 *U.S.* 1, 90 *S.Ct.* 1999, 26 *L.Ed.*2d 387 (1970) (counsel must be provided in all pretrial proceedings that are critical in the criminal prosecution). Court decisions protecting the constitutional rights of defendants have given rise to new pretrial proceedings that frequently have a

major effect on the outcome of a prosecution. *E.g., United States v. Wade,* 388 *U.S.* 218, 87 *S.Ct.* 1926, 18 *L.Ed.*2d 1149 (1967); *Miranda v. Arizona,* 384 *U.S.* 436, 438, 86 *S.Ct.* 1602, 1609, 16 *L.Ed.*2d 694 (1966); *Jackson v. Denno,* 378 *U.S.* 368, 84 *S.Ct.* 1774, 12 *L.Ed.*2d 908 (1964); *State v. Driver,* 38 *N.J.* 255 (1962). As a result of these developments, proceedings in advance of trial are now of central importance in our system of criminal adjudication. *United States v. Criden,* 675 *F.*2d 550, 555–57 (3 Cir.1982); see *Gannett, supra,* 443 *U.S.* at 397 n. 1, 99 *S.Ct.* at 2914 n. 1, 61 *L.Ed.*2d at 632 n. 1 (Powell, J., concurring); *id.* at 434–39, 99 *S.Ct.* at 2933–35, 61 *L.Ed.*2d at 655–59 (Blackmun, J., concurring in part and dissenting in part).

There are, we are satisfied, important institutional values that are served by opening criminal pretrial proceedings to the public. In view of the heightened role of the pretrial phases of a criminal prosecution, the closure of pretrial proceedings, as the closure of the trial itself, can naturally detract from "the functioning of the judicial process and the government as a whole." *Globe Newspaper, supra,* ——— *U.S.* at ———, 102 *S.Ct.* at 2620, 73 *L.Ed.*2d at 256. Conducting pretrial criminal proceedings in an atmosphere of secrecy is offensive to the general public and undermines the public trust essential to an effective judicial system. Exclusion of the public compromises the appearance of fairness because "secret hearings—though they be scrupulously fair in reality—are suspect by nature. Public confidence cannot long be maintained where important judicial decisions are made behind closed doors and then announced in conclusive terms to the public, with the record supporting the court's decision sealed from public view." *Gannett, supra,* 443 *U.S.* at 429, 99 *S.Ct.* at 652–53 (Blackmun, J., concurring in part and dissenting in part) (quoting *United States v. Cianfrani,* 573 *F.*2d 835, 851 (3 Cir.1978)). In addition to kindling public misperception and eroding public confidence, closure of significant pretrial proceedings perpetuates general ignorance and cuts off public knowledge necessary to a full understanding of the criminal justice system. *See Gannett, supra,* 443 *U.S.* at 428–29,

99 *S.Ct.* at 2830–31, 61 *L.Ed.*2d at 652. Conversely, the openness of pretrial hearings in criminal causes fosters an informed public "discussion of governmental affairs." *Globe Newspaper, supra,* —— *U.S.* at ——, 102 *S.Ct.* at 2619, 73 *L.Ed.*2d at 256; *see State v. Allen, supra,* 73 *N.J.* at 155–56 (Pashman, J., concurring). Open proceedings contribute to the public's knowledge and encourage a general appreciation of the administration of criminal justice. Consequently, real benefits redound to the judiciary as a governmental institution—the judicial function itself is enhanced—by providing public access to criminal pretrial proceedings.

In addition to these considerations, the Supreme Court gave significant weight to the unbroken tradition of public openness in finding a constitutional right of public access to a criminal trial. Although the history of open criminal pretrial proceedings is not centuries old, we nevertheless believe that the tradition of openness in these proceedings has become sufficiently pronounced to have earned "the favorable judgment of experience." *Globe Newspaper,* —— *U.S.* at ——, 102 *S.Ct.* at 2619, 73 *L.Ed.*2d at 256 (quoting *Richmond Newspapers,* 448 *U.S.* at 589, 100 *S.Ct.* at 2834, 65 *L.Ed.*2d at 997) (Brennan, J., concurring in the judgment)). As noted earlier, pretrial hearings have evolved into an important component of the administration of criminal justice over the past several decades. The near uniform practice in the federal and state court systems has been to conduct pretrial criminal proceedings in open court.[5] The expe-

---

[5]Jurisdictions have expressed their practices in several fashions, including statute, *e.g.,* Ark.Stat.Ann. § 22–109 (Repl.1962); Cal.Penal Code § 868 (West 1982); Ga.Code Ann. § 2–111 (1977); Ind.Code Ann. § 35–1.1–2–1 (West 1977); Mich.Stat.Ann. § 27A.1420 [M.C.L.A. § 600.1420] (Callaghan 1980); Nev.Rev.Stat. § 171.204 (1979); N.Y.Jud.Law § 4 (McKinney 1983); Wis.Stat.Ann. § 757.14 (West 1981); court rule, *e.g.,* R. 1:2–1 (N.J.); *Pa.R. Crim.P.* 323(f) (suppression hearings); and decisional law construing constitutional or statutory provisions, *e.g., Sacramento Bee v. United States District Court,* 656 *F.*2d 477 (9 Cir.1981), *cert.* den., 456 *U.S.* 983, 102 *S.Ct.* 2257, 72 *L.Ed.*2d 861 (1982); *United States v. Brooklier,* 685 *F.*2d 1162 (9 Cir.1982); *Phoenix Newspapers Inc. v. Jennings,* 107 *Ariz.* 557, 490 *P.*2d 563 (Ariz.1971);

rience in New Jersey is parallel. Since the adoption of our current Constitution in 1947, the rules governing New Jersey courts have endorsed a strong and consistent policy in favor of open judicial proceedings.[6]

---

*Shiras v. Britt,* 267 *Ark.* 97, 589 *S.W.2d* 18 (Ark.1980); *Star Journal Pub. Corp. v. County Court,* 197 *Colo.* 234, 591 *P.2d* 1028 (Colo.1978); *State v. Burak,* 37 *Conn.Sup.* 627, 431 *A.2d* 1246 (Conn.Sup.1981); *United States v. Edwards,* 430 *A.2d* 1231 (D.C.App.1981); *Miami Herald Pub. Co. v. Lewis,* 383 *So.2d* 236 (Fla.App.1982); *R.W. Page Corp. v. Lumpkin,* 249 *Ga.* 576, 292 *S.E.2d* 815 (Ga.1982); *Gannett Pacific Corp. v. Richardson,* 59 *Hawaii* 224, 580 *P.2d* 49 (Hawaii 1978); *State v. Porter Superior Court,* 412 *N.E.2d* 748 (Ind.1981); *Ashland Publications Co. v. Asbury,* 612 *S.W.2d* 749 (Ky.App. 1980); *Patuxent Pub. Corp. v. State,* 48 *Md.App.* 689, 429 *A.* 554 (Md.Sp.App. 1981); *Keene Pub. Corp. v. Chesire County Superior Court,* 119 *N.H.* 710, 406 *A.2d* 137 (N.H.1979); *Westchester Rockland Newspapers v. Leggett,* 48 *N.Y.* 2d 430, 399 *N.E.2d* 518, 423 *N.Y.S.2d* 630 (N.Y.1979); *State ex rel. Dayton Newspapers, Inc. v. Phillips,* 46 *Ohio St.2d* 457, 351 *N.E.* 127 (Ohio 1976); *Commonwealth v. Hayes,* 489 *Pa.* 419, 414 *A.2d* 318 (Pa.1980); *Rapid City Journal v. Circuit Court,* 283 *N.W.2d* 563 (S.D.1979); *Herald Ass'n Inc. v. Ellison,* 138 *Vt.* 529, 419 *A.2d* 323 (Vt.1980); *Richmond Newspapers v. Virginia,* 222 *Va.* 574, 281 *S.E.2d* 915 (Va.1981); *Federated Publications v. Kurtz,* 94 *Wash.2d* 51, 615 *P.2d* 440 (Wash.1980); *State ex rel. Herald Mail Co. v. Hamilton,* 267 *S.E.2d* 544 (W.Va.1980); *Williams v. Stafford,* 589 *P.2d* 322 (Wyo.1979); *see also* Revised Report of the Judicial Conference Committee on the Operation of the Jury System on the "Free Press-Free Trial" Issue, 87 *F.R.D.* 519 (1980); American Bar Association "Standards Relating to the Administration of Criminal Justice: Fair Trial and Free Press," Standard 8–3.2 (2d ed. 1980).

[6]The current version of this rule, *R.* 1:2–1, provides, in relevant part, that
 [a]ll trials, hearings of motions and other applications, pretrial conferences, arraignments, sentencing conferences (except with members of the probation department) and appeals shall be conducted in open court unless otherwise provided by rule or statute.
The recognized exceptions to this rule are few and are themselves carefully limited. See, *e.g., N.J.S.A.* 2A:84A–21.4 (*in camera* inspection of confidential documents of newsperson to determine probable admissibility); *N.J.S.A.* 2C:14–7 a. (*in camera* hearing to determine admissibility of evidence of sexual conduct of victim of sex offense); *R.* 3:6–7 (secrecy of grand jury proceedings); *R.* 3:13–3(d)(2) (private showing by prosecution to support protective order limiting discovery and inspection by defendant). This strong judicial and public policy of openness is also reflected in this Court's guidelines regulating electronic and photographic coverage of the courtroom. *Guidelines for still and television camera and audio coverage of*

Thus, we are satisfied that "both logic and experience" (*Globe Newspaper*, —— *U.S.* at ——, 102 *S.Ct.* at 2620, 73 *L.Ed.2d* at 257) confirm the institutional value of open pretrial hearings in criminal cases. Accordingly, we conclude that the First Amendment embraces a right of access in the press and public to criminal pretrial proceedings.

Although we firmly believe that the federal constitutional right of access extends to criminal pretrial proceedings, we acknowledge that the Supreme Court in *Richmond Newspapers* and *Globe Newspaper* carefully confined its decisions to the criminal trial itself. *Richmond Newspapers, supra,* 448 *U.S.* at 563–64, 100 *S.Ct.* at 2820–21; 65 *L.Ed.2d* at 981 (plurality opinion); *Globe Newspaper, supra,* —— *U.S.* at ——, 102 *S.Ct.* at 2619, 73 *L.Ed.2d* at 256. In the absence of a definitive Supreme Court determination on this question,[7] we consider the State Constitution as an alternative basis for the public's right of access to the pretrial stages of a criminal prosecution. *See State v. Schmid,* 84 *N.J.* 535, 553 (1980), app. dism. *sub nom. Princeton University and New Jersey v. Schmid,* 455 *U.S.* 100, 102 *S.Ct.* 867, 70 *L.Ed.2d* 855 (1982); *State v. Saunders,* 75 *N.J.* 200, 220 (1977) (Schreiber, J., concurring). We have in important cases willingly resorted to our State Constitution as an independent source of individual rights. *See Right to Choose v. Byrne,* 91 *N.J.* 287 (1982); *State v. Schmid, supra.* We have not hesitated to recognize and vindicate individual rights under the State Constitution where our own constitutional history, legal traditions, strong public policy and special state concerns warrant such action. *State v. Hunt,* 91 *N.J.* 338 (1982); *id.* at 358

---

*proceedings in the Courts of New Jersey* § 10. Those judicial proceedings associated with a criminal prosecution that have traditionally been closed frequently implicate interests other than the defendant's fair trial rights, which interests are beyond the focus of these appeals.

[7]The Supreme Court recently granted *certiorari* in the case of *Press-Enterprise Co. v. Superior Court,* —— *U.S.* ——, 103 *S.Ct.* 813, 74 *L.Ed.2d* 1012 (1983) to consider the constitutionality of mandatory closure of the voir dire process in capital cases.

(Handler, J., concurring). These considerations have especial pertinency in dealing with the constitutional issues in this case.

██ The courts of this State have consistently noted the constitutional concern for the freedoms of expression. *See, e.g., State v. Miller,* 83 *N.J.* 402 (1980). We have recognized the "exceptional vitality in the New Jersey Constitution with respect to individual rights of speech and assembly . . .," *State v. Schmid, supra,* 84 *N.J.* at 557. The Court has acknowledged that the significant role of the press in gathering news "is entitled to special constitutional protection." *State v. Lashinsky,* 81 *N.J.* 1, 13 (1979); *see Maressa v. New Jersey Monthly,* 89 *N.J.* 176 (1982). We have enforced the strong public policy that favors the press and protects the press function. *State v. Boiardo,* 82 *N.J.* 446 (1980) (*Boiardo* I); *State v. Boiardo,* 83 *N.J.* 350 (1980) (*Boiardo* II). Further, we have observed that the provisions of the State Constitution dealing with expressional freedoms antedate the application of the First Amendment to the states and are set forth more expansively. *State v. Schmid, supra,* 84 *N.J.* at 557; *Maressa v. New Jersey Monthly, supra,* 89 *N.J.* at 206–07 (1982) (Schreiber, J., dissenting). In the specific context of the courtroom, we have concluded that proceedings open to the public are of vital importance and closure of pretrial evidentiary hearings should occur rarely and only "with circumspection." *State v. Allen, supra,* 73 *N.J.* at 145; *see State v. Hannah,* 171 *N.J.Super.* 325 (App.Div.1979); *State v. Joyce, supra.*

██ We are fully persuaded that a public right of access to criminal pretrial proceedings under the provisions of Art. I, par: 6 of the State Constitution, comparable to that based upon the ˙ First Amendment, can be found by addressing the same substantive concerns and employing the same analytical principles of constitutional interpretation invoked in *Richmond Newspapers* and *Globe Newspaper.* In defining the basis and character of this significant state constitutional right, we need not decide whether the provisions of the State Constitution require more

extended protection of expressional freedoms in this context than the First Amendment as we have interpreted it under the guidance of the *Richmond Newspapers* and *Globe Newspaper* decisions.

We have already noted the exceptionally vigorous judicial tradition in this State that favors open judicial proceedings. *Supra* at 55–56. This Court has stressed "that court proceedings should be subject to public scrutiny and that the public has a right to expect that criminal trials will be conducted in open court," *State v. Allen, supra,* 73 *N.J.* at 144. In addition, we have recognized the important institutional values served by the conduct of pretrial hearings in open court. *Supra* at 54–55. Open proceedings and, in particular, "press coverage perform numerous beneficial functions ... [and] increase the respect for the law through an 'intelligent acquaintence' with the administration of justice." *State v. Allen, supra,* 73 *N.J.* at 159–60. (Pashman, J., concurring) (citation omitted).

In light of the significant governmental benefits, strong public policy, important social values, vigorous tradition and consistent practice of open judicial proceedings in this State, we conclude that the interest of the public and the press in such open proceedings reaches constitutional proportions. Accordingly, we hold that under the State Constitution the general public and the press possess a protectible right to be present during the conduct of criminal pretrial proceedings and, further, that these rights as recognized under the State Constitution are fully consistent with those that are found under and protected by the First Amendment.

### III

The constitutional rights of the public and the press to attend judicial proceedings do not exist in a vacuum. The exercise of these rights can conflict with other rights and interests of equal magnitude. Frequently the conflict involves the rights of a defendant to a fair criminal trial before an impartial jury. *Cf.*

*Boiardo* II, *supra; Boiardo* I, *supra; In re Farber,* 78 *N.J.* 259, cert. den. *sub nom. New York Times v. New Jersey,* 439 *U.S.* 997, 99 *S.Ct.* 598, 58 *L.Ed.*2d 670 (1978) (important interest of press in confidentiality of sources, though not constitutional, must be weighed against criminal defendant's constitutional right to a fair trial).

Under the Sixth Amendment of the United States Constitution and Art. I, par. 10 of the New Jersey Constitution, criminal defendants are guaranteed "the right to ... trial by an impartial jury." In both of the cases before us the defendant claims that a public pretrial hearing will jeopardize this right because reporting by the news media of information presented at the hearing will prejudice potential jurors. In considering these claims we must assess the nature of an impartial jury guaranteed to defendants under the federal and State constitutions.

 The securing and preservation of an impartial jury goes to the very essence of a fair trial. *See Sheppard v. Maxwell,* 384 *U.S.* 333, 362–63, 86 *S.Ct.* 1507, 1522, 16 *L.Ed.*2d 600, 620 (1966); *Estes v. Texas,* 381 *U.S.* 532, 85 *S.Ct.* 1628, 14 *L.Ed.*2d 543, reh. den., 382 *U.S.* 875, 86 *S.Ct.* 18, 15 *L.Ed.*2d 118 (1965). It has long been recognized under the federal constitution that a defendant is entitled to a jury that is free of outside influences and will decide the case according to the evidence and arguments presented in court in the course of the criminal trial itself. *Patterson v. Colorado,* 205 *U.S.* 454, 462, 27 *S.Ct.* 556, 558, 51 *L.Ed.* 879, 881 (1907) (Holmes, J.).

 The courts in this State have recognized that under the State Constitution, Art. I, par. 10, the right of a defendant to be tried by an impartial jury is of exceptional significance. We have stressed repeatedly that the triers of fact must be "as nearly impartial 'as the lot of humanity will admit.'" *State v. Singletary,* 80 *N.J.* 55, 62 (1979) (quoting *State v. Jackson,* 43 *N.J.* 148, 158 (1964) cert. den. *sub nom. Ravenell v. New Jersey,* 379 *U.S.* 982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965)); *id.,* 80 *N.J.* at 70 (Clifford, J., dissenting); *id.* at 74 (Handler, J., dissenting);

see *In re Kozlov,* 79 *N.J.* 232, 239–40 (1979); *State v. Wagner,* 180 *N.J.Super.* 564, 567 (App.Div.1981); *see also N.J.S.A.* 2A:78–1 to –9 (implementing legislation intended to insure the impanelling of impartial jurors). This requirement of fairness—and particularly jury impartiality—is heightened in cases in which the defendant faces death. The death penalty is a categorical imperative for trial fairness. *See, e.g., Beck v. Alabama,* 447 *U.S.* 625, 637–38, 100 *S.Ct.* 2382, 2389–90, 65 *L.Ed.* 2d 392, 403 (1980); *State v. Jackson, supra,* 43 *N.J.* at 156; *State v. Mount,* 30 *N.J.* 195, 213 (1959); *State v. Wynn,* 21 *N.J.* 264, 271 (1956).

So important is the quality of impartiality in the trial of criminal prosecutions that jurors who have formed an opinion as to the guilt or innocence of the defendant must be excused. *See State v. Van Duyne,* 43 *N.J.* 369, 386 (1964), *cert.* den., 380 *U.S.* 987, 85 *S.Ct.* 1359, 14 *L.Ed.2d* 279 (1965); *In re Kozlov, supra.* Only if it is demonstrated that "the juror can lay aside his impression or opinion and render a verdict based upon the evidence presented in court" will extraneous exposure to the facts of the case not be grounds for automatic disqualification. *State v. Sugar,* 84 *N.J.* 1, 23 (1980) (quoting *Dobbert v. Florida,* 432 *U.S.* 282, 97 *S.Ct.* 2290, 53 *L.Ed.2d* 344 (1977)); *State v. Conyers,* 58 *N.J.* 123, 143–44 (1971); *see also State v. Trantino,* 45 *N.J.* 37 (1965). In cases of sensational or inflammatory publicity the federal courts have employed a presumption of partiality in evaluating prospective jurors. *See, e.g., Irvin v. Dowd,* 366 *U.S.* 717, 723, 81 *S.Ct.* 1639, 1642–43, 6 *L.Ed.2d* 751, 756 (1961); *United States v. Blanton,* 700 *F.2d* 298 (6 Cir.1983) (scheduled for *en banc* rehearing).

In sum, the defendant in a criminal trial has a constitutional right to be fairly tried by an impartial jury. That constitutional right, rooted in both the Sixth Amendment of the federal constitution and Art. I, par. 10 of the State Constitution, is entitled to the most zealous protection in the context of a criminal prosecution in which the defendant faces the death

penalty. It is the tension between this constitutional imperative for fairness and the right to open criminal pretrial proceedings that is at the heart of the controversy before the Court.

## IV

Our present task is to ease the tension between these competing constitutional rights. We must determine the standards to be applied by trial courts in balancing, on the one hand, the constitutional right of public access to criminal pretrial proceedings and, on the other, the constitutional right of a defendant to a fair trial before impartial jurors. We consider the key to the solution of this difficult and delicate problem to be the central role of the court itself in ensuring the integrity of the judicial process, which includes the proper accommodation of these contesting constitutional interests.

## A

■ The judicial branch has an overarching constitutional responsibility to guarantee the proper administration of justice, *N.J. Const.* (1947), Art. VI; *Winberry v. Salisbury,* 5 *N.J.* 240 (1950), and particularly, the administration of criminal justice. *State v. Leonardis,* 73 *N.J.* 360 (1977) (*Leonardis* II); *State v. Leonardis,* 71 *N.J.* 85 (1976) (*Leonardis* I); *see State v. Gaffey,* 92 *N.J.* 374 (1983). In numerous contexts, we have remarked upon the independent obligation of the court to take all appropriate measures to ensure the fair and proper administration of a criminal trial. *E.g., State v. Bell,* 90 *N.J.* 163, 173 (1982); *State v. Bellucci,* 81 *N.J.* 531, 544 (1980); *see In re Hinds,* 90 *N.J.* 604, 617 (1982). A vital aspect of this responsibility is the court's duty to preserve the jury's impartiality throughout the trial process. *In re Kozlov, supra,* 79 *N.J.* at 239–40;. *see In re Petit Jury Panels, Essex County,* 60 *N.J.* 554, 561–62 (1972).

■ Judicial solicitude for the impartiality of the jury finds expression in a variety of settings, *e.g.,* impanelling of jury, *State v. Deatore,* 70 *N.J.* 100, 105–06 (1976); examination of

jurors, *State v. Manley,* 54 *N.J.* 259, 269 (1969); challenge for cause, *State v. Singletary, supra,* 80 *N.J.* at 62; challenge to impanelled juror, *State v. Grillo,* 16 *N.J.* 103, 112 (1954); jury instructions, *State v. Powell,* 84 *N.J.* 305, 319 (1980); cautionary instructions, *State v. Steffanelli,* 78 *N.J.* 418, 434–35 (1979). Further, the court has an independent duty to act swiftly and decisively to overcome the potential bias of a jury from outside influences. *State v. Allen, supra,* 73 *N.J.* at 142; *State v. Kavanaugh,* 52 *N.J.* 7, cert. den. *sub nom. Matzner v. New Jersey,* 393 *U.S.* 924, 89 *S.Ct.* 254, 21 *L.Ed.2d* 259 (1968).

The Supreme Court has emphatically underscored the court's responsibility in assuring the impartiality of the jury in a criminal case. *Irvin v. Dowd, supra,* 366 *U.S.* at 722–23, 81 *S.Ct.* at 1642–43, 6 *L.Ed.2d* at 756. It has stressed that the trial court's duty in this regard extends to the pretrial stages of the prosecution as well as during trial. *Sheppard v. Maxwell, supra,* 384 *U.S.* at 362–63, 86 *S.Ct.* at 1527, 16 *L.Ed.2d* at 620. And, it must be added, the trial court's responsibility under both the federal and State constitutions to preserve the integrity of the jury and minimize the danger that prejudice will infiltrate the adjudicatory process is at its peak in cases involving the death penalty. *See Beck v. Alabama, supra; State v. Jackson, supra.*

B

In view of this judicial responsibility, we adopt the following balancing test as to the closure of pretrial proceedings in criminal prosecutions: All pretrial proceedings in criminal prosecutions shall be open to the public and the press. In the context of these cases, the only exception to this rule will arise in instances in which the trial court is clearly satisfied that if the pretrial proceeding is conducted in open court there is a realistic likelihood of prejudice to a fair trial by an impartial jury as a result of adverse publicity, and, further, that such prejudice cannot be overcome by resort to various methods relating to the selection of jurors that will be available to the court at the time of trial.

We deem it appropriate that the defense be required to make an application for closure in order to show that the defendant's fair trial rights will be jeopardized by recognizing the public and press rights to open court proceedings. The defendant's application, therefore, should ordinarily be supported by evidence of extensive prior adverse publicity on the case that, together with the adverse publicity anticipated from an open pretrial proceeding, is sufficient to support an inference that the publicity will create bias in the minds of potential jurors as to the guilt of the defendant or as to any material issue in the case. We do not believe the imposition of this burden of proof will pose an undue hardship upon the defendant. The evidence of adverse pretrial publicity is either in the possession of the defense or can be marshalled by it. Also, the natural inferences of potential prejudice to be drawn therefrom are matters that are felt most acutely by the defense.[8] *Cf. Santosky v. Kramer*, 455 *U.S.* 745, 102 *S.Ct.* 1388, 71 *L.Ed.*2d 599 (1982); *In re Polk License Revocation*, 90 *N.J.* 550 (1982) (burden of proof should take into account nature of interest involved and the relative ability of parties to marshall proofs).

In evaluating defendant's application the court must assess all the evidence and circumstances that are relevant to a determination of the likelihood of jury prejudice. It must give careful consideration to the publicity that will be generated by the particular hearing and its cumulative impact in conjunction with all preexisting publicity. The court must also be especially mindful of the nature of the particular pretrial proceeding for which closure is sought. It must ascertain the contested issues that are the subject of the particular proceeding, the nature and form of the anticipated evidence that will be material to these

---

[8]Although we have imposed upon the defendant the burden to make an application for closure, such an application can be made by the prosecutor or by the court itself if circumstances appropriately justify that action.

issues and the character of the adverse publicity that may be generated from an open hearing disclosing such evidence.[9] In capital cases where a jury must determine in a separate trial whether to impose the sentence of death or life imprisonment upon a guilty defendant, trial courts must exercise special caution in weighing the effects of adverse publicity on the impartiality of the jury that will be required to determine the sentence as well as the jury that will determine guilt or innocence. The court may draw reasonable inferences from such evidence as to whether the adverse publicity in its totality will be widely and repeatedly disseminated throughout the community and will give the average person exposed to such publicity an impression of defendant's guilt or foster a bias against the

---

[9]Of special significance in each of the cases on appeal is the unique nature of the bail hearing in capital cases and its special potential for prejudice. Under *R.* 3:26–1, bail can be denied to those persons "charged with crimes punishable by death [only] when the prosecutor presents proof that there is a likelihood of conviction and reasonable grounds to believe that the death penalty may be imposed...." Under the murder statute, a defendant must be provided with a bifurcated trial so that the issue of criminal guilt and the issue of the imposition of the death penalty are tried separately, either by the same or different juries. *N.J.S.A.* 2C:11–3(c)(1). Hence, evidence relevant in the second trial relating to the imposition of the death penalty might well be inadmissible in the trial of defendant's guilt. The defendant's right to a fair trial in a capital case would clearly encompass both phases of the bifurcated trial.

In proving "reasonable grounds to believe that the death penalty may be imposed" in a bail hearing, the prosecutor may refer to the aggravating and mitigating circumstances outlined in *N.J.S.A.* 2C:11–3 c(4)–(5). Under the terms of the murder statute, the death penalty will apply only when "any aggravating factor exists and is not outweighed by one or more mitigating factors...." *N.J.S.A.* 2C:11–3 c(3)(a). Many of these factors relate to the defendant's prior criminal history and personal character, evidence of which would ordinarily be admissible only in the portion of the bifurcated trial concerning the imposition of the death penalty. Evidence of these matters is not ordinarily admissible in the trial on the substantive issue of criminal guilt. *See, e.g., Evid.R.* 47 and *Evid.R.* 55. Such evidence could, therefore, be highly prejudicial to the defendant's fair trial right with respect to both the criminal liability and sentencing trials if adduced at an open pretrial bail hearing and widely publicized throughout the community.

defendant on any particular material issue.[10] If, upon this evidential basis, the court is clearly satisfied that there is a realistic likelihood that the defendant's right to an impartial jury will be threatened by adverse publicity emanating from an open pretrial proceeding, then the court must consider whether means other than closure of the pretrial proceeding are available to preserve the fairness of the trial.

In considering the alternatives to closure, the court should address the entire panoply of procedures that can be invoked at the time of trial relating to the selection of jurors and the management of the jury. In our view, the trial court is possessed of knowledge and experience that place it in a position superior to that of any of the parties to engage in the inquiry and reach a reasoned conclusion as to such available alternative means for assuring the impanelling of an impartial jury.

---

[10]Not surprisingly, empirical studies in the social science literature seem to support the conclusion that pretrial publicity biases jurors. Padawer-Singer & Barton, "The Impact of Pretrial Publicity on Jurors' Verdicts," in Simon, ed., *The Jury System in America: A Critical Overview* (1975); Doob, "Evidence, Procedure, and Psychological Research," in Bermant, Nemeth & Vidmar, eds., *Psychology and the Law: Research Frontiers* (1976); Simon, "Murder, Juries, and the Press," 3 *Trans-Action* 40 (1966); Simon & Eimermann, "The Jury Finds Not Guilty: Another Look at Media Influence on the Jury," 48 *Journalism Q.* 343 (1971); Sue, Smith & Caldwell, "Effects of Inadmissible Evidence on the Decisions of Simulated Jurors: A Moral Dilemma," 3 *J.Applied Soc.Psych.* 345 (1973); Sue, Smith & Gilbert, "Biasing Effects of Pretrial Publicity on Judicial Decisions," 2 *J.Crim.Just.* 163 (1974); Tans & Chaffee, "Pretrial Publicity and Juror Prejudice," 43 *Journalism Q.* 647 (1966); Wilcox, "The Press, the Jury & the Behavioral Sciences," 9 *Journalism Monographs* 20 (1968).

However, there is also some reason to believe that even in highly publicized cases the venire will contain many individuals who have not been exposed to the publicity or who, if exposed, are only faintly aware of the nature of the case. *See, e.g., United States v. Ehrlichman,* 546 *F.2d* 910, 916–17 n. 8 (D.C.Cir.1976); *United States v. Haldeman,* 559 *F.2d* 31, 61–63 (D.C.Cir.1976); *State v. Joyce,* 160 *N.J.Super.* 419, 430 (Law Div.1978). It has been noted that those parties directly involved in a criminal prosecution tend to overestimate the reach of the publicity. *United States v. Pageau,* 535 *F.Supp.* 1031, 1033 (N.D.N.Y.1982); *United States v. Haldeman, supra,* 559 *F.2d* at 62–63 n. 37.

Hence, in this phase of the closure proceeding, it is entirely appropriate that the trial court utilize its own special judicial expertise and experience to determine and evaluate the character, availability, feasibility and efficacy of alternative methods of safeguarding against prejudice.[11]

With respect to such alternatives, the court should consider and ascertain whether the source of potential jurors is sufficiently large and diverse so as to assure the impanelling of a jury unbiased by preexisting adverse publicity. The court should explore the feasibility of augmenting the pool of eligible jurors in the vicinage, and should consider the practicability of using citizens from beyond the particular vicinage to serve as potential jurors, the use of so-called "foreign jurors." [12] Similarly, a change of trial venue may help to overcome the risk of prejudice.[13]

---

[11]The court should permit and may require any party to present relevant evidence and argument in order to assist it in reaching a proper determination on the question of alternative procedures.

[12]R. 3:14–2 provides for use of a foreign jury "if the court finds that a fair and impartial trial cannot otherwise be had." Although foreign juries have rarely been utilized, *Standards Relating to the Administration of Criminal Justice* § 8–3.5(d) Commentary at 22 n. 23 (2 ed. Tent. Draft 1978), they are a potential means of overcoming pretrial publicity. *State v. Sugar,* 84 *N.J.* 1, 23–24 (1980). The use of foreign jurors in certain circumstances arguably may implicate the right of a defendant to be tried by a jury of peers. Further, under our present rule, *R.* 1:8–3(d), when the court impanels a foreign jury, the defendant's peremptory challenges are reduced from 20 to 5. Also, *R.* 3:14–2 presently authorizes only the assignment judge to require a foreign jury. We hereby determine that the trial judge should be authorized to impanel a foreign jury and that the number of peremptory challenges shall not be reduced if at the time of trial a foreign jury is required by the trial court in the exercise of its sound discretion. In these respects, *R.* 1:8–3(d) and *R.* 3:14–2 are superseded.

[13]A change of venue has the same benefits and drawbacks as the impanelling of a foreign jury since both methods utilize jurors from communities where publicity may be less intense. Under current practice, a change of venue is not readily granted. *See State v. Wise,* 19 *N.J.* 59, 73–74 (1955) (defendant must establish "clear and convincing proof that a fair and impar-

 Another important, indeed critical, means for dealing with potential and latent bias is the voir dire.[14] The court should consider the efficacy of more exhaustive and searching voir dire examinations. The court in conducting the voir dire should be particularly responsive to the requests of counsel regarding the examination of prospective jurors as to potential bias.[15] The court could consider whether there should be a greater willingness to resolve doubts in favor of the defendant in excusing jurors for cause.[16] Particularly in capital cases, trial

---

tial trial cannot be had before a jury in the county where the indictment was found.") If, however, the trial court determines in its sound discretion at time of trial that a change of venue is necessary to overcome the realistic likelihood of prejudice from pretrial publicity, a change of venue may be ordered. In this context, *State v. Wise* will no longer apply.

[14]*Compare* Padawer-Singer, Singer & Singer "Voir Dire By Two Lawyers: An Essential Safeguard," 57 *Judicature* 386 (1974) (the voir dire process substantially reduced the bias created by exposure to pretrial publicity) *with* Broeder, "The University of Chicago Jury Project," 38 *Nebraska L.Rev.* 744 (1959); Fahringer, "In the Valley of the Blind: A Primer on Jury Selection in a Criminal Case," 43 *Law and Contemporary Problems* 116 (1980). *See also* Fahringer, "Charting a Course From the Free Press to a Fair Trial," 12 *Suffolk U.L.Rev.* 1, 11 (1978); Babcock, "Voir Dire: Preserving 'Its Wonderful Power,'" 27 *Stan.L.Rev.* 545, 547 (1975); Craig, Erickson, Friesen & Maxwell, "Voir Dire: Criticism and Comment," 47 *Denver L.J.* 465, 473 (1970); Garry & Riordan, "Gag Orders: *Cui Bono*," 29 *Stan.L.Rev.* 575, 585 (1977) (discussing limitations of voir dire in terms of revealing conscious predisposition and unconscious bias).

[15]The present procedural framework for jury voir dire, *R.* 1:8–3(a); *State v. Manley,* 54 *N.J.* 259 (1969), would permit this exercise of discretion by the trial judge.

[16]Some studies indicate that instructions can eliminate or reduce the effect of prejudicial publicity, *see* Simon, "Does the Court's Decision in *Nebraska Press Association* Fit the Research Evidence on the Impact on Jurors of News Coverage?" 29 *Stan.L.Rev.* 515 (1977); Kline & Jess, "Prejudicial Publicity: Its Effect on Law School Mock Juries," 43 *Journalism Q.* 113 (1966), while other studies indicate that such cautionary instructions are ineffective, *see* Padawer-Singer, Singer & Singer, *supra;* Padawer-Singer & Barton, *supra;* Doob, *supra;* Sue, Smith & Caldwell, *supra;* Sue, Smith & Gilbert, *supra,* or counterproductive, *see* Wolf & Montgomery, "Effects of Inadmissible Evidence and Level of Judicial Admonishment to Disregard on the Judgments of

judges should exercise extraordinary care in the voir dire of potential jurors and could excuse for cause any juror who has been exposed to sensational prejudicial publicity, especially where such exposure is repeated and involves patently inadmissible evidence. The court should also be mindful of the need to fashion effective cautionary jury instructions and to increase the frequency of their application.

Upon completion of the hearing, the court must reach an ultimate determination as to the realistic likelihood of prejudice and the need for closure based upon (1) the evidence relevant to the nature and extent of the adverse publicity generated by the open pretrial proceeding, including any inferences as to its potential for prejudice against a fair trial by an impartial jury, and (2) the evidence relating to the efficacy of the available means of selecting jurors and conducting the trial to assure the integrity and impartiality of the jury.[17]

---

Mock Jurors," 7 *J. Applied Soc. Psych.* 205 (1977); Oros & Ellman, "Impact of Judge's Instructions upon Jurors' Decisions: The Cautionary Charge in Rape Trials," 10 *Representative Research Soc. Psych.* 220 (1977); Broeder, *supra.*

[17]We have noted that a constitutional right of access to criminal pretrial proceedings has not yet been declared by the Supreme Court. *Supra* at 52 n. 3. We nevertheless recognize that the balancing test that we now adopt does not coincide exactly with any of the formulations suggested in the several *Gannett* opinions. Justice Stewart, writing for a five member majority in *Gannett*, did not determine whether a right of access to pretrial hearings was guaranteed by the First Amendment and therefore did not formulate any standard for balancing the right of access and the right to a fair trial. Nevertheless, the Court held the trial court's decision to close the pretrial hearing because "even assuming [without deciding] that the First and Fourteenth Amendments may guarantee such access in some situations, . . . this putative right was given all appropriate deference" by the trial court, which had determined that "an open proceeding would pose a 'reasonable probability of prejudice to these defendants.'" *Gannett, supra,* 443 *U.S.* at 392–93, 99 *S.Ct.* at 2912, 61 *L.Ed.*2d at 629. The majority concluded that "[i]n short, the closure decision was based on 'an assessment of the competing societal interests involved . . . rather than on any determination that First Amendment freedoms were not implicated.'" *Id.* at 393, 99 *S.Ct.* at 2912, 61 *L.Ed.*2d at 629 (quoting *Saxbe v. Washington Post Co.,* 417 *U.S.* 843, 860, 94 *S.Ct.* 2811, 2819–20, 41 *L.Ed.*2d 514, 525 (1974) (Powell, J., dissenting)).

## C

The balancing test that we now establish for the disposition of closure applications applies generally to all criminal prosecu-

---

Justice Powell, concurring, recognized a First Amendment right of access and offered more definite guidance on how the competing rights of openness and fairness should be balanced. He required the defendant "to make *some showing that the fairness of his trial likely will be prejudiced by* public access to the proceedings.... [Then,] members of the press and public who object to closure have the responsibility of *showing to the court's satisfaction* that alternative procedures are available that would eliminate the dangers shown by the defendant and the State." *Id.* at 401, 99 *S.Ct.* at 2916, 61 *L.Ed.2d* at 635 (emphasis added). However, Justice Powell did not quantify the showing required of the defendant nor indicate the standard of proof that must be met by the defendant or the representatives of the press or the public in order to satisfy their burdens.

Justice Blackmun, joined in dissent by Justices Brennan, White and Marshall, articulated a three-prong test that presumes proceedings will be open "unless a defendant carries his burden to demonstrate a strict and inescapable necessity for closure" in order to protect his fair-trial guarantee. *Id.* at 443, 99 *S.Ct.* at 2937, 61 *L.Ed.2d* at 661. The accused must show that there is a substantial probability that: (1) an open hearing will irreparably damage his fair trial right; (2) alternatives to closure will not adequately insure his right to a fair trial; and (3) closure will effectively protect his rights. *Id.* at 441–42, 99 *S.Ct.* at 2937, 61 *L.Ed.2d* at 660–61.

Although different from each of these formulations in certain respects, the balancing test here prescribed is one that conforms to our own State Constitution and, we believe, is fully compatible with the First Amendment. Like our formulation, the various formulae in *Gannett* seek to achieve the same underlying objective, namely, a proper accommodation of competing constitutional interests in order to assure the integrity of the criminal judicial process. The somewhat different phraseology utilized in this opinion is intended to impress upon trial courts the need for meticulous and conscientious decision-making in evaluating motions for closure. In addition, the allocation of the burden of proof as to the relevant issues in a closure hearing in our test reflects our judgment as to the unique position and responsibility of the court itself, the comparative ability of the parties to address the issues and the nature of the underlying interests involved. *See, e.g., Santosky v. Kramer,* 455 *U.S.* 745, 102 *S.Ct.* 1388, 71 *L.Ed.2d* 599 (1982); *Mathews v. Eldridge,* 424 *U.S.* 319, 96 *S.Ct.* 893, 47 *L.Ed.2d* 18 (1976); *In re Polk License Revocation,* 90 *N.J.* 550 (1982). To ensure a proper accommodation of the competing concerns, the *trial court itself* must be clearly satisfied that the need for closure is shown by a preponderance of the evidence—not clear and convincing evidence, as assumed by the dissent. *Post* at 77.

tions. We recognize, however, that trial courts will be required to invoke this test in a wide, almost limitless variety of situations. In particular the concerns that are raised in capital cases are especially acute and will entail extraordinary care and attention by trial and appellate judges. It is unwise to attempt to foresee all contingencies that may confront courts when asked to resolve the competing constitutional claims upon a closure application. We therefore deem it appropriate that the procedure to be followed in evaluating closure applications be the subject of a continuing study to be undertaken jointly by the Supreme Court's Committee on the Criminal Rules of Procedure and the Committee of Judges on Capital Causes.[18] We are nonetheless convinced that trial courts must follow certain minimum procedures and general guidelines to assure overall consistency, uniformity and soundness in the application of this test.[19]

---

[18]The Committees should consider the need for systematic rule changes in cases where special measures for the impanelling of a jury are required as a result of massive adverse pretrial publicity. They should consider all of the alternatives mentioned in this opinion, *supra* at 66–68, and any other procedures that can be devised to assure juror impartiality (*e.g.*, sequestration during voir dire and trial). They should also determine whether special procedural rules are necessary in evaluating motions for closure of pretrial proceedings in capital cases. In the meantime, trial courts are hereby directed pursuant to the discretionary authority provided in *R.* 1:1–2 (relaxation of rules) to apply the standards set forth in this opinion.

[19]To the extent that the decisions in *State v. Allen, supra, State v. Hannah, supra,* and *State v. Joyce, supra,* are inconsistent with the balancing test prescribed today, those decisions are superseded by today's holding. Furthermore, the decision in *State v. Obstein, supra,* in its treatment of bail hearings in capital cases, is overruled to the extent it conflicts with this decision. This conclusion is now required in view of our interpretation of both the State and federal constitutions.

In light of the circumstances that the United States Supreme Court has not directly addressed the constitutional issues raised in these cases, we must acknowledge the possibility that the federal constitution will be interpreted in a manner more restrictive of the right of access to pretrial criminal proceedings than that required by our State Constitution and our interpretation of the federal constitution. *See Branzburg v. Hayes,* 408 *U.S.* 665, 92 *S.Ct.* 2646, 33 *L.Ed.2d* 626 (1972). If this eventuality should arise,

**72**

■ The press and other interested parties should have the opportunity to be heard in any closure application. *See, e.g., United States v. Criden, supra,* 675 *F.*2d at 558–59; *Richmond Newspapers v. Virginia,* 222 Va. 574, 281 *S.E.*2d 915, 923 (Va. 1981); *see also Globe Newspaper, supra,* —— *U.S.* at ——, n. 25, 102 *S.Ct.* at 2622 n. 25, 73 *L.Ed.*2d at 259 n. 25; *Gannett, supra,* 443 *U.S.* at 401, 99 *S.Ct.* at 2916, 61 *L.Ed.*2d at 634 (Powell, J., concurring). Trial courts shall ensure that representative members of the press receive notice of the motion for closure and shall provide appropriate representatives of the press and public the opportunity to participate in the proceedings upon the closure application. The parties allowed to participate shall be determined by the trial court in its sole discretion in order to assure not only that the representatives of the press and public are heard and the court's ultimate decision is informed and soundly based, but that duplication and delay are avoided and the proceedings are not unduly prolonged. Those parties permitted to participate shall have the right to file responsive or answering pleadings and briefs regarding the defendant's appli-

---

we do not believe that the balancing test and the standards designed to implement that test as announced in this opinion would be imperiled. To the extent that our own Constitution accords a more expansive right of access to pretrial hearings than may eventually be determined by the Supreme Court, we are confident that the defendant's countervailing right to a fair trial can still be preserved and will remain uncompromised. *Cf. PruneYard Shopping Center v. Robins,* 447 *U.S.* 74, 100 *S.Ct.* 2035, 64 *L.Ed.* 2d 741 (1980) (state's more expansive right of public access to private shopping center not violative of taking clause of Fifth Amendment or due process clause of Fourteenth Amendment). Because the test and implementing standards established today place the trial court at the center of the process that will determine the propriety of closure, the court will have the ultimate responsibility to ensure the defendant a fair trial by an impartial jury while accommodating the rights of the press and the public to be present at pretrial proceedings. If, contrary to our expectation, experience indicates that the rights of defendants to a fair trial by an impartial jury are not sufficiently protected by the test that we have adopted today, the test may, of course, be modified by this Court in order to provide for a more satisfactory balance between the constitutional concerns of openness and fairness.

cation for closure and may present evidence as directed by the court.

█ At the hearing on the closure application the trial court should consider whether any portion of such hearing on the application must be closed in order to identify the critical issues and review anticipated offers of evidence. By this direction, we intend no more than to emphasize the discretionary authority of the trial judge to ensure that the potentially prejudicial material is not prematurely revealed before the meritorious issue itself can be resolved. *See Globe Newspaper, supra,* —— *U.S.* at —— n. 25, 102 *S.Ct.* at 2622 n. 25, 73 *L.Ed.2d* at 259 n. 25; *In re Farber, supra.* We do not anticipate, however, that this will occur with any great frequency or that the entire closure hearing will ordinarily be closed. *Patuxent Publ. Corp. v. Maryland,* 48 *Md.App.* 689, 429 *A.2d* 554, 556–57 (Md.Ct. of Sp.App.1981); *Richmond Newspapers v. Virginia, supra,* 281 *S.E.2d* at 923.

█ The court must indicate to the parties and disclose on the record its findings of fact and the basis for its conclusion as to closure. This is particularly important as to matters with respect to which the court takes judicial notice and relies primarily upon its own expertise. Articulation of such findings and conclusions on the record is, of course, essential for intelligent judicial review.

V

In these cases, we appreciate that, in addressing the closure issues, the parties and lower courts did not have the benefit of the balancing test and implementing standards and guidelines set forth in this opinion. As an *interim* measure we determined that the particular proceedings at issue—the bail hearing in *Williams* and the probable cause and bail reduction hearings in *Koedatich*—should go forward and, pending a decision by this Court, should be held *in camera.* In effect, we provisionally reversed the initial rulings of the trial court in advance of our

decision on the merits, resolving any doubts in favor of the defendants' constitutional claims. In light of this decision, however, we are satisfied that our provisional orders closing the proceedings can now be vacated. Because these pretrial proceedings have already been held, albeit while closed, there is no necessity to conduct these pretrial proceedings anew or to continue closure hearings relating to these particular proceedings.

Accordingly, we vacate the closure orders in each case and direct that the transcripts of the respective proceedings may be released to the public and the press.

*For vacation of Interim Order*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and GARIBALDI—6.

*For remandment and dissenting*—Justice SCHREIBER—1.

SCHREIBER, J., dissenting.

The responsibility for safeguarding the right to a fair trial lies at the heart of the question before this Court. This responsibility is never more important than when, as here, the defendants face the possibility of a sentence of death. It is in part the sensitivity to the extreme nature of that sanction that leads me to dissent. The majority today promulgates the following test to be applied by trial courts on motions for closure: the trial court, after "*meticulous and conscientious*" consideration, must be "*clearly satisfied*" "by a *preponderance of the evidence*" that there is a "*realistic likelihood* . . . that a defendant will be unable to secure a *fair trial* before an *impartial jury* if the pretrial proceeding is conducted in open court." (emphasis added). It is also my dissatisfaction with the confusing nature of the posited standard that leads me to dissent.

The specific issue in these cases is whether a pretrial hearing, either to establish probable cause or set bail, should, at the instance of the defendants, be closed to the press. The resolution of the issue requires a balancing of the federal constitution-

al rights of the accused and the press, for it is the inherent conflict between these interests that gives rise to the problem at hand.

The Sixth Amendment guarantees the defendant a right to a trial "by an impartial jury." Justice Stewart in *Gannett Co. v. DePasquale,* 443 *U.S.* 368, 379, 99 *S.Ct.* 2898, 2905, 61 *L.Ed.2d* 608, 621 (1979), wrote for a majority of the Supreme Court:

Closure of pretrial proceedings is often one of the most effective methods that a trial judge can employ to attempt to insure that the fairness of a trial will not be jeopardized by the dissemination of [prejudicial] information throughout the community before the trial itself has even begun.[1]

The First Amendment has been interpreted to afford the public and the press the right to be present at criminal trials. *Globe Newspaper Co. v. Superior Court,* —— *U.S.* ——, 102 *S.Ct.* 2613, 73 *L.Ed.2d* 248 (1982). This right insures a significant public role in the judicial process. Thus open proceedings safeguard the integrity of the fact-finding process, assure the appearance of fairness, and serve as a check on judicial administration.

First and Sixth Amendment guarantees are at times at odds with each other.[2] Supreme Court opinions throw some light on the proper balancing of those respective rights. *Globe Newspaper* involved a Massachusetts statute that provided for a closed hearing automatically when a rape victim, who was a minor, testified. The Supreme Court declared the statute unconstitutional. It pronounced the press' First Amendment right to be present during the trial proceedings and held that the statutory automatic closure provision violated the press' First Amendment

---

[1]Reversal of a conviction after trial is an extreme remedy and, therefore, trial judges should be "overcautious [in the administration of proceedings before and during jury selection to] ensur[e] that a defendant will receive a fair trial." *Gannett Co. v. DePasquale,* 443 *U.S.* at 379 n. 6, 99 *S.Ct.* at 2905, 61 *L.Ed.2d* at 621.

[2]Both the First and Sixth Amendments are applicable to the states via the Fourteenth Amendment. *See De Jonge v. Oregon,* 299 *U.S.* 353, 57 *S.Ct.* 255, 81 *L.Ed.* 278 (1937) (First Amendment); *Duncan v. Louisiana,* 391 *U.S.* 145, 88 *S.Ct.* 1444, 20 *L.Ed.2d* 491 (1968) (Sixth Amendment).

right. In doing so, it emphasized that its holding was a narrow one, that the First Amendment right was not an absolute, and that a statute properly framed could withstand constitutional attack. The reason for closure in *Globe Newspaper* was not to insure a fair trial. When the defendant in a criminal proceeding seeks closure, he relies upon his federal constitutional right to a fair trial, which is more compelling than a state statutory policy.

The Supreme Court has indicated guidelines for the proper balancing of these First and Sixth Amendment rights in *Gannett Co. v. DePasquale*. Justice Stewart, in writing for the Court, accepts the test that a defendant, on moving for closure, should show a reasonable probability of prejudice. 443 *U.S.* at 393, 99 *S.Ct.* at 2912, 61 *L.Ed.*2d at 629.[3] In addition, as Justice Powell asserts in his concurring opinion, those who object to closure should have "the responsibility of showing to the court's satisfaction that alternative procedures are available that would eliminate the dangers shown by the defendant and the State." *Id.* at 401, 99 *S.Ct.* at 2916, 61 *L.Ed.*2d at 635. (Powell, J., concurring).

By according priority to the First Amendment, the majority of this Court has placed the First and Sixth Amendments in a different perspective from that adopted by the United States Supreme Court. The majority of this Court declares that all pretrial criminal proceedings must be open to the public, unless there is a "realistic likelihood" that the defendant will be unable to obtain a fair trial. The majority rejects the *Gannett* standard without explanation and adopts a new test without elucidation. Implicitly, it assumes that the *Gannett* test is not compatible with our State Constitution. How and why remain unknown. Moreover, the majority insists that the defendant

---

[3]Justice Powell furnished the fifth vote in his concurring opinion in which he agreed that the "reasonable probability" standard was satisfactory. 443 *U.S.* at 403, 99 *S.Ct.* at 2917, 61 *L.Ed.*2d at 636. This standard seems to be the equivalent of a "reasonable likelihood" referred to in *Sheppard v. Maxwell*, 384 *U.S.* 333, 363, 86 *S.Ct.* 1507, 1522, 16 *L.Ed.*2d 600, 620 (1966).

"clearly" show a "realistic likelihood" that he will be unable to obtain an impartial jury as a result of adverse publicity. *Ante* at 48, 63–64. By introducing this requirement, the majority has increased the burden on the defendant beyond that approved by the majority in *Gannett.*

The majority in a footnote, *ante* at 69 n. 17 contends that, while the trial court must be *clearly* satisfied that the burden is met, the defendant's burden of proof is only a preponderance of the evidence. The addition of the word "clearly" when related to what the fact finder must do is not a semantic change, and the majority intends that its use of the word have a substantial effect. The word "clearly" charges a fact finder with the obligation to be more than satisfied that the greater weight of credible evidence supports a specific factual finding. The correlative of the nature or weight of the evidence is the effect of that proof on the mind of the judge or jury. Realistically, to say that one must be clearly satisfied that a fact has been proven by a preponderance of the evidence is simply another way of saying that the evidence must clearly and convincingly produce a firm belief in the existence of the fact. Similarly, to say that one must be satisfied beyond a reasonable doubt that a fact has been proven by a fair preponderance of the evidence is simply another way of saying that the evidence must produce a belief in the fact beyond a reasonable doubt. The distinction between a finding supported by a preponderance of the evidence and a finding supported by clear and convincing evidence becomes a distinction without a difference if in either case the trier of fact must be clearly and convincingly satisfied of the existence of the fact. Pragmatically, a court will reach the same result in both cases.

By requiring the trial court as a fact finder to be *clearly* satisfied, the majority has added to the defendant's burden. The use of the word "clearly" places the standard, if anywhere, within the burden of proof category of clear and convincing.

The majority implicitly concedes as much when it states that the reason for the additional requirement is to ensure substantial priority of the press' First Amendment rights over a defendant's Sixth Amendment right to a fair trial, that is, "a proper accommodation of the competing concerns." *Ante* at 70 n. 17. No other justification is asserted for inserting the word "clearly" when referring to the trial court's duty.

The difference in the additional burden is apparently substantial. We have generally applied three different standards of proof: preponderance, clear and convincing, and beyond a reasonable doubt. *Evid.R.* 1(4). Our courts have stated that the differences between these classifications are not semantic.

Clear and convincing evidence should produce in the mind of the trier of fact "a firm belief or conviction as to the truth of the allegations sought to be established." *Aiello v. Knoll Golf Club,* 64 *N.J.Super.* 156, 162 (App.Div.1960); *see also In re Boardwalk Regency Casino License Application,* 180 *N.J.Super.* 324, 339 (App.Div.1981), aff'd except as modified, 90 *N.J.* 361 (1982). In *Aiello* the court, in defining the phrase, "clear and convincing," quoted the following language from *Tapler v. Frey,* 184 *Pa.Super.* 239, 132 *A.*2d 890, 893 (1957): "[The evidence must be] so clear, direct and weighty and convincing as to enable either a judge or jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." "Clear and convincing" is said to establish a standard of proof falling somewhere between the other two categories. It has also been said to be more closely akin to proof beyond a reasonable doubt. *See State v. Cale,* 19 *N.J.Super.* 397, 400 (App.Div.1952).

Preponderance of evidence on the other hand is evidence sufficient to generate a belief that the conclusion advanced is likely. It has been stated in terms of reasonable probability. *See Kahalili v. Rosecliff Realty, Inc.,* 26 *N.J.* 595, 607 (1958); *see also In re Polk License Revocation,* 90 *N.J.* 550 (1982) (noting

difference between the preponderance and the clear and convincing standards.)

In addition to imposing the more onerous burden of proof on the defendant by using the "clearly" standard, the majority may have thrust on the defendant the requirement that he negate the adequacy of alternatives. Proof of the efficacy of alternatives logically and reasonably belongs on the objecting member of the public or press.[4] At this juncture of the analysis, after the defendant has shown that his fair and impartial trial is imperiled, closure is presumptively valid. The party who objects should then be required to establish by a preponderance of the evidence that there are alternative remedies that make closure unnecessary. See "The Supreme Court, 1978 Term," 93 Harv.L. Rev. 1, 72 (1979).

Lastly, the majority's new standard, "realistic likelihood," is apparently not the same as "reasonable probability," the standard espoused in Gannett. The burden of clearly showing a realistic likelihood appears to be something more than "reasonable probability." I make that assessment because the majority has not remanded these proceedings to permit the defendants the opportunity of offering proofs to satisfy its new criteria. The majority is apparently convinced that the defendants could not possibly meet that standard. It may well be that "[i]t is difficult to imagine a case where closure could be ordered appropriately under" the majority's standard. Gannett, 443 U.S. at 399, 99 S.Ct. at 2915, 61 L.Ed.2d at 634 (Powell, J., concurring).

The majority, instead of giving due recognition to a defendant's Sixth Amendment rights, has submerged his interest in procuring an impartial jury, when his life may be at stake, to the press' interests in being present to obtain a news story. It accomplishes this result by purportedly relying on the federal

---

[4]It is clear under the majority opinion that this burden is not on the public or the press.

and New Jersey Constitutions. Reliance on the New Jersey Constitution does not seem wise jurisprudentially.

First, if the First Amendment to the federal constitution guarantees the right of the public and press to be present at probable cause and bail pretrial hearings, there is no necessity to turn to the State Constitution. Second, if there is no federal First Amendment right to attend these pretrial proceedings, the validity of a state constitutional right would depend on the extent and nature of the defendant's federal Sixth Amendment constitutional right, as explicated and to be explicated by the Supreme Court. Defining the press' state constitutional right is of little moment without knowing the pull and impact of the defendant's federal constitutional right.

Third, nothing is gained by interpreting the State Constitution at this time. The Court loses the benefit of important experience. The Court would have been able to observe the impact of its decision in these cases and others that follow on subsequent pretrial and trial proceedings. It also would be the beneficiary of additional input from the Supreme Court and other tribunals. Lastly, since it is not necessary or essential that the Court resort to the State Constitution (the same result could be reached through the rulemaking power), the Court surrenders the flexibility it would otherwise have. This concept lies at the root of the rather firmly established principle that issues should be decided on nonconstitutional grounds when possible. Judicial resilience and progress suffer when the path chosen by the majority is used. This is particularly so since we are unaware at this time of the breadth and scope of the recently recognized First Amendment right of the public and press to be present at criminal proceedings.

As previously observed, I would at least remand to afford these defendants, against whom the prosecution proposes to seek the death penalty, an opportunity to attempt to meet the standards promulgated this day by the majority.