199 N.J. Super. 502 (1985)
489 A.2d 1235
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ROBERT O. MARSHALL, DEFENDANT-RESPONDENT, AND ASBURY PARK PRESS, RADIO STATION WJLK AND PHILADELPHIA NEWSPAPERS, INC., INTERVENORS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued February 25, 1985.
Decided March 20, 1985.
*503 Before Judges KING, DEIGHAN and BILDER.
Rosalie Burrows argued the cause for appellants The Asbury Park Press and Radio Station WJLK (McCarter & English, attorneys; Richard M. Eittreim, of counsel).
Warren M. Faulk argued the cause for appellant Philadelphia Newspapers, Inc. (Brown, Connery, Kulp, Wille, Purnell & Greene, attorneys; the firm of Kohn, Savett, Marion & Graf, of the Pennsylvania Bar, of counsel).
Edward J. Turnbach, Ocean County Prosecutor, argued the cause for respondent, State of New Jersey.
Glen A. Zeitz argued the cause for respondent Marshall (Zeitz & Talty, attorneys).
The opinion of the court was delivered by KING, P.J.A.D.
*504 This motion for leave to appeal is taken by three media intervenors from a partial closure order entered at a bail hearing in a case where the State seeks the death penalty against two defendants and a life sentence against a third. The media intervenors, two newspapers and a radio station, seek disclosure of a detailed 25-page statement by an alleged co-conspirator, McKinnon, a forensic report by the State Police crime laboratory prepared following examination of a tire on defendant Marshall's car, and an eight-page transcript of an in camera discussion of these items. Both the State and the defendant Marshall oppose disclosure of these documents prior to trial.[1]
The matter was before us previously. On December 31, 1984 I heard oral argument in chambers on the media appellants' emergent application for leave to appeal. At that time the panel decided that neither Judge Huber nor the interested media had received sufficient notice of the possibility of a closure application to hold the type of hearing contemplated by State v. Williams, 93 N.J. 39, 70-73 (1983). We therefore denied leave to appeal on January 3, 1985 without prejudice to the media appellants to formally intervene in the Law Division and to seek a Williams' closure hearing before Judge Huber. They did so and the judge denied their application for release of McKinnon's detailed 25-page statement, the State Police forensic report, and the in camera transcript, because of potential prejudice to defendants' rights to fair trials. On February 28, 1985 after oral argument on this motion we filed our order granting leave to appeal, R. 2:2-3(b), noting that the appeal *505 would be decided on the merits on an accelerated basis, R. 2:9-2; R. 2:11-2, and that an opinion would issue "as soon as feasible." This is our conclusion.
In this case the State seeks the death penalty against defendants Marshall and Thompson for the killing of Marshall's wife in Lacey Township, Ocean County, on September 7, 1984. The State alleges that Marshall hired Thompson and McKinnon to kill his wife at a roadside turnoff near Oyster Creek on the Garden State Parkway, a limited-access turnpike which follows the Atlantic coastline in Ocean County. The State contends that Thompson and McKinnon were engaged to make the slaying look like a random robbery of the Marshall couple, resulting in her death and an assault on him. On September 7, 1984 at about 1 a.m. Marshall's wife was shot and killed in the parking lot; defendant Robert Marshall was struck on the head and allegedly rendered unconscious at that time.
The State alleges that Thompson was the killer for hire, that Marshall was the instigator, and that Cumber was also involved in the transaction, although perhaps never actually in New Jersey. McKinnon was also allegedly implicated and his detailed statement to the authorities is at the core of the present dispute. McKinnon has obviously turned State's evidence. He is now in protective custody in New Jersey. We understand that he stands prepared to testify and implicate Marshall, Thompson and perhaps Cumber, after having been insulated by a favorable plea agreement exposing him to a relatively short prison term.
The Prosecutor informs us that the trials probably will not begin until early Fall 1985. He says that there will certainly be two, and perhaps three, trials to resolve the matter. Motions for change of venue have been made by defendant Marshall. But his counsel candidly tells us that he is not sure whether or not he will press them, or if so, what venue he would urge on the court. We know nothing of the proposed strategy of defendants Thompson and Cumber in this regard. Thus we are *506 presently not at all certain when, where, and exactly how these matters will come to trial.
We must decide whether Judge Huber's decision of January 17, 1985 adhering to his closure order of December 24, 1984 meets the test of State v. Williams, supra.
Defendant Marshall was not charged with murder until December 21, 1984. On December 24 he moved for a reduction of his $1.5 million bail. On the same day, the State moved for revocation of bail on the ground that this was a capital case; defendant Marshall's lawyer then moved in open court for closure at the start of the proceeding on December 24. The judge, who did not know the closure motion would be made, denied the motion at the inception of the hearing. The media was not represented by counsel at the December 24 bail hearing and closure motion. We understand that at least one reporter was present.
When the detailed statement of McKinnon implicating Marshall and the other defendants emerged, Judge Huber held an in camera conference and ordered the transcript of that conference and the two exhibits sealed and closed to the public. The greatest part of the bail hearing was in public. The public portion of the transcript is 45 pages; the closed portion is nine pages.
The judge summarized the publically-available aspect of the testimony at the December 24 bail hearing as follows: Lieutenant Churchill testified to fatal gunshot wounds on Marie Marshall's body, and a two-inch cut in the sidewall of the right rear tire on the Marshall car; Detective Mahoney testified about the eight insurance policies of $1.5 million on Maria Marshall's life with defendant Robert Marshall as beneficiary. Marshall allegedly had turned off the Parkway into the picnic area because of suspected tire trouble.
Judge Huber recognized that our Supreme Court's opinion in Williams required a balancing of the "First Amendment right of free access of press and public to pretrial proceedings" *507 against a defendant's constitutional right to a fair trial. In reaching his conclusion on partial closure the judge stated
Now, I would venture to say, and it is my opinion, that this right of the press and the public to pretrial proceedings has been largely met in this case. There is no question that there was a short conference, colloquy in the jury room. There is no question further that the Court sealed the forensic report and the statement. But certainly the press was advised, during the course of the proceedings, that this was a statement incriminating Mr. Marshall and that the forensic report, according to the testimony of Lieutenant Churchill in open court, resulted from their removal of the right rear tire with the attendant cut that he had noticed and the forwarding of same to the State Police Lab.
This is a balancing, as I say, of the First Amendment right of free access of press and public to pretrial proceedings against defendant's equally important right to a trial by jury which will be fair and impartial. It is a delicate balancing in this case and it is made more delicate by the nature of the charge against Mr. Marshall.
He first discussed the alternatives to closure in this capital case and then opted to continue partial closure, saying
It seems to me there are a variety of alternatives which would be perfectly satisfactory in a case. You could get a foreign jury; you could have an extensive voir dire; you could change the venue to wherever, whatever county of the twenty-one that you might choose that would have the facilities and the parties could get to without undue stress. Those alternatives are there and I think in the ordinary kind of case there would be no problem.
But what about this kind of case and the things which the press seeks to print in toto? How do you keep out of the minds of the jurors  and I think it goes without saying that we can assume that jurors anywhere in the state are going to read this just before trial; they're going to be subjected to it  a complete statement of a co-conspirator in a murder case that's been printed the day or the week before they're to report for jury duty? It's news. Why wouldn't it be printed? Because once access is granted, there's no restraints on what you do with it, how you handle it, how many times you repeat it. It's unlimited. How can one insure that? Wherever one goes in the state one would read or hear these facts; that a co-conspirator of defendant Robert Marshall has made this statement involving Marshall in all of these details over the full twenty-five pages. How do you eliminate that? Can you really be sure that you can eliminate it?
I think I'd have to be sure that you can by one of those alternatives and, frankly, I'm not that sure that I could and, as I say, for that reason, assuming that I'm in error that the objectives of Williams have largely been met just by the handling of the case on the twenty-fourth, I can say that it is my opinion that none of these alternatives can block out the devastating effect of the statement of Billy Wayne McKinnon in toto on potential jurors anywhere in the state and for this reason I will order that the statement, the forensic report and the short transcript remain sealed.
*508 Our court rules require that all proceedings "shall be conducted in open court unless otherwise provided by rule or statute." R. 1:2-1. Judge Pressler has aptly summarized the Williams opinion exception to this rule in her current comment on the Rules of Court.
The New Jersey Supreme Court most recently addressed the problem of the in camera proceeding in criminal actions, and particularly, the issue of closed pretrial proceedings in State v. Williams, 93 N.J. 39 (1983). Recognizing the potential prejudice which a defendant might sustain as a result of adverse pretrial publicity, the Court nevertheless concluded "that the public and the press have a protectible constitutional interest in access to all pretrial proceedings in the prosecution of a criminal case." Accordingly the Court held that all pretrial proceedings must be open to the public and the press except in those cases "in which the trial court is clearly satisfied that that as a result of adverse pretrial publicity, a realistic likelihood exists that a defendant will be unable to secure a fair trial before an impartial jury if the pretrial proceeding is conducted in open court." Id. at 48. The Court further made clear that it is the defendant who has the burden of persuasion, that the press has a right to be heard and that in making the determination as to closure the trial judge must consider the availability and efficacy of such protective techniques as a change of venue (R. 3:14-2), the use of a foreign jury (R. 3:14-2), the careful voir dire of prospective jurors (R. 1:8-3), and the use of cautionary instructions. Thus State v. Williams settles the issue at least in respect of pretrial proceedings. Cf. In re Search of C Co. Premises, 115 N.J. Super. 262, 266 (App.Div. 1971); State v. Joyce, 160 N.J. Super. 419 (Law Div. 1978), affirmed sub nom. State v. DeBellis, 174 N.J. Super. 195 (App.Div. 1980); State v. Hannah, 171 N.J. Super. 325 (App.Div. 1979); State v. Grecco, 187 N.J. Super. 421 (App.Div. 1982). Nevertheless, in view of the uncertainty of application of the holding of Gannett v. DePasquale [443 U.S. 368] 99 S.Ct. 2898 [61 L.Ed.2d 608] (1979), the question still remains open as to the extent to which the trial court may, during the trial, conduct an evidentiary hearing, which in any event would be conducted out of the presence of the jury and which might result in the eliciting of testimony both prejudicial to the defendant and ultimately excluded. While it is clear that an order to the press not to publish the substance of the evidentiary hearing until after the jury's verdict has been rendered does constitute a first amendment violation, it is also clear that the alternatives of jury sequestration and of cautionary instructions may be practically unsatisfactory. The guideline thus offered by the Supreme Court in State v. Allen, 73 N.J. 132, 146 (1977) on the assumption, although not the holding, of the constitutionality of the in camera hearing is that
* * * it should be used with circumspection. The trial court should first resort to other alternatives unless it concludes that they are not feasible or proper under the circumstances. Only then, and upon a clear showing of a serious and imminent threat to the integrity of the trial, and with the express *509 consent of the defendant, should consideration be given to holding the evidentiary hearing in camera.

See also Comment on R. 1:8-3(b). [Pressler, Current N.J. Court Rules Comment R. 1:2-1].
For general background on the problem see LaFave and Israel, Criminal Procedure § 22.1(d) at 757-762 (1984), which points out that closure at a pretrial proceeding is a less severe remedy than closure at trial, where closure usually is unnecessary because the jury can be sequestered. If pretrial closure is ordered, "a transcript of the portion of the proceedings closed must be made available at the earliest time consistent with protection of defendant's right to a fair trial." Id., § 22.1 at 761 n. 46; see also Gannett v. DePasquale, 443 U.S. 368, 392-393, 99 S.Ct. 2898, 2911-2912, 61 L.Ed.2d 608 (1979); ABA Standards for Criminal Justice § 8-3.2, 8-3.6(1) (2nd ed. 1980). We speak here of a temporary, not an absolute ban on disclosure. The media intervenors however press for the "right to know immediately," urging that they have an absolute right to "fresh news."
We disagree and conclude that Judge Huber's order of partial closure respected the media's right of access and the defendant's historic Sixth Amendment rights to a fair trial and to confront his accusers in open court, not in the press or on television. See Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The contents of McKinnon's 25-page detailed statement do not become actual evidence of guilt against Marshall until McKinnon is sworn in open court and confronted on cross-examination. Until then the statement is only a piece of paper, not constitutionally proper evidence against Marshall. It is proof of nothing but is simply an assertion by an unsworn and suspect source in the sway of the State. See Davis v. Alaska, 415 U.S. 308, 311-315, 94 S.Ct. 1105, 1107-1109, 39 L.Ed.2d 347 (1974).
Uncontrolled dissemination of McKinnon's statement in the county ultimately chosen for trial, just before the jury will be *510 picked and before sequestration would be possible, might very well jeopardize a fair hearing if McKinnon were to recant, not appear for some reason, or substantially dilute his present contentions. If McKinnon did not testify and his unsworn, unchallenged detailed statement were widely disseminated immediately before jury selection, as we believe it would be, and if one or several capital verdicts were returned, we might very well never know if the ultimate penalties were fairly obtained and inflicted. In this context, we endorse the ruling of Judge Huber calling for partial, temporary closure and for the media's patience, on the balance against the risk of the chance of death penalties imposed, not on solid evidence, but on hearsay evidence from an untested source.
Under Williams, pretrial closure is permitted where "the trial court is clearly satisfied that as a result of adverse publicity, a realistic likelihood exists that a defendant will be unable to secure a fair trial before an impartial jury." Williams 93 N.J. at 48. Closure "should occur rarely and only with circumspection." Id. at 58. But as Justice Handler reminds us "a defendant is entitled to a jury that is free of outside influences and will decide the case according to the evidence and arguments presented in the course of the criminal trial itself." Id. at 60. We are further mindful of his caution that the requisite of fairness "is heightened in cases in which the defendant faces death," id. at 61, 459 A.2d 641, and of the court's "independent duty to act swiftly and decisively to overcome the potential bias of a jury from outside influences," id. at 63, 459 A.2d 641.
The general facts shown and contentions advanced at the December 24 bail hearing are known to the press and public. All the fine details will be eventually available to the press and public. The bail proceeding was open and the result known: Marshall was held without bail on a capital charge. We are satisfied that the defendant Marshall, joined on the closure application by Prosecutor Turnbach, has shown by a *511 preponderance of the evidence, see Williams at 93 N.J. 70, n. 17, a realistic likelihood of prejudice by premature disclosure of his alleged cohort McKinnon's claimed incriminating statement and the allegedly corroborating forensic laboratory report.
Affirmed.
NOTES
[1] Only defendant Marshall appeared by counsel at oral argument. The other capital defendant Thompson had just been extradited from Louisiana at about the time of oral argument. We will assume for present purposes that Thompson, being similarly situated with Marshall so far as the State's contentions are concerned, shares the same view on disclosure. The third alleged conspirator, Cumber, is in the Ocean County Jail following extradition from Louisiana on December 3, 1984.