218 N.J. Super. 149 (1987)
526 A.2d 1165
STATE OF NEW JERSEY, PLAINTIFF,
v.
BYRON HALSEY, DEFENDANT.
Superior Court of New Jersey, Law Division Union County.
Decided March 26, 1987.
*151 Edmund J. Tucker and Eleanor Clark for plaintiff (John H. Stamler, Union County Prosecutor, attorney).
Joan Van Pelt and Dolores Delabar for defendant (Alfred A. Slocum, Public Defender, attorney).
Edward Lamb and Jack Sabatino for intervenor Newark Morning Ledger Company (Robinson, Wayne, Levin, Riccio & LaSala, attorneys).
*152 Richard A. Ragsdale for intervenor The Courier News (Strauss & Hall, attorneys).
David Scott Mack for intervenor The Daily Journal (McGimpsey & Cafferty, attorneys).
WOLIN, J.S.C.
By the filing of certain aggravating factors the State has determined that defendant, Byron Halsey, is death eligible. He seeks to minimize the effect of pretrial publicity through closure of pretrial proceedings and enhancement of jury selection procedures. The focus of this opinion is the resolution of those issues within the framework of the basic contours recently sketched by the New Jersey Supreme Court in the cases of State v. Ramseur, 106 N.J. 123 (1987) and State v. Biegenwald, 106 N.J. 13 (1987).
On November 15, 1985, Tyrone and Tina Urquhart were murdered and later found in the cellar of their home. Defendant, Byron Halsey, has been accused and indicted for the commission of these crimes. A trial date of May 12, 1987 has been scheduled. Through an array of motions filed on behalf of defendant, certain pretrial issues remain to be resolved that of necessity must be determined in advance of trial. They are: closure of designated pretrial proceedings, change of venue, increased peremptory challenges, counsel voir dire participation, and jury selection through implementation of the struck-jury system. The court shall discuss and decide these matters in the order of their statement.

Closure of Designated Pretrial Hearings.
In advance of the determination of State v. Biegenwald, both the court and counsel had anticipated hearings on certain pretrial aspects of the case that, if given great notoriety in the press, could substantially impact on defendant's right to a fair and impartial trial. Defendant, fully aware of the sensitivity of these motions, moved for closure which was opposed by the *153 State as well as the organized press. The press' participation in these proceedings arise from this court's adherence to the mandate of notice set forth in State v. Williams, 93 N.J. 39, 72 (1983). At the hearing on the closure application the court closed a portion of such hearing to permit the court to identify the critical issues so as to ensure that potentially prejudicial material is not prematurely revealed that would adversely impact on defendant's rights under the Sixth Amendment of the United States Constitution and Art. I, par. 10 of the New Jersey Constitution. State v. Williams, supra at 73; State v. Marshall, 199 N.J. Super. 502 (App.Div. 1985). During this in camera proceeding counsel for the press was permitted to remain subject to their viva voce representation that defendant's proffer by way of identification of critical issues would remain confidential and not be revealed to the assembled reporters.
Defendant's presentation in support of closure consisted of approximately 40 newspaper articles and two television tapes provided by CBS and NBC news that were a composite of news programs broadcasted throughout the metropolitan area immediately after the discovery of these crimes and during their early investigation. Also submitted were statistical data directed towards population, households, newspaper circulation and an extrapolation of readership in Union County.
The leading authorities on a motion for closure are State v. Williams, supra, and Press Enterprise Company v. Superior Court, 478 U.S. ___, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986). Each recognizes the tension that exists between the public's right of access to a pretrial proceeding under the First and Sixth Amendments of the United States Constitution and Art. I, pars. 6 and 10 of the New Jersey Constitution. Yet, despite that tension, each determined that the right to an open public trial is a shared right of the accused and the public, the common concern being the assurance of fairness. Press Enterprise Co., supra, 478 U.S. at ___, 106 S.Ct. at 2739, 92 L.Ed.2d at 9. While the right is not absolute, it prevails unless *154 defendant can demonstrate that there is a realistic likelihood that his right to an impartial jury will be threatened from adverse publicity emanating from an open trial proceeding and means other than closure are not available to preserve the fairness of the trial. The stated standard is the very least that defendant must demonstrate. It is arguably no longer viable in light of Press Enterprise Co.'s post-Williams decision that the preliminary hearing shall be closed only if specific findings are made demonstrating that first, there is a substantial probability that defendant's right to a fair trial will be prejudiced by publicity that closure would prevent, and second, the reasonable alternatives to closure cannot adequately protect defendant's fair trial rights. With both of these yardsticks in mind, the court is satisfied that the existing pretrial publicity does not mandate closure. Further, that the critical issues proffered in camera, if considered immediately in advance of jury selection, would offend either standard and that a course of action other than closure will remove the existent constitutional tension and promote harmony between articles and amendments that seemingly, in this context, appear to be constitutionally repugnant to each other.
The court's analysis commences with the 40 newspaper articles submitted by defendant in support of his application for closure and change of venue. In terms of time, they span the period immediately following the occurrence of the crime through March 1987, a segment of approximately 17 months. (There were articles published every day from November 16, 1985 to November 21, 1985. Thereafter, articles were published on November 27, 1985, January 16, 1986, February 28, 1986, November 15, 1986, February 18, 1987 and February 19, 1987 for a total of 12 days in which articles concerning the incident appeared in the newspaper.) Thirteen of the articles received front page treatment, nine of the articles contained pictures of defendant, five included pictures of Tina Urquhart, and one showed Tyrone's x-ray with a nail in his head. Some articles made no mention of defendant; others recounted his criminal *155 and social history, and at least three asserted his innocence. These articles were, for the most part, objective accounts of early investigatory findings focused on the week succeeding the crime's occurrence. There has not been a continuous flow of coverage except for that centered around the initial occurrence and that precedent to these applications. Nothing contained in the articles is tainted with the stain of patent inadmissibility, and what was contained in the articles will more than likely partake of evidence at the trial. Unlike Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), the articles were not vicious nor impelling of a carnival atmosphere. While the photograph of the x-ray of Tyrone Urquhart with a nail in his head is potentially inflammatory, no indication of that impact has been surveyed and presented to the court. It also was published approximately 17 months ago.
The impact of the newspaper coverage is appropriate to the consideration of the composite of television news tapes. They occurred 17 months ago, were reportorial of the investigation, fleetingly displayed an x-ray of Tyrone with nails in his head, and broadcasted Prosecutor Stamler characterizing this case as "the ultimate child abuse" and stating that he would seek the death penalty. No estimate of the size of the viewing public was submitted, but it is fair to infer that major network news reached most New Jersey households with television sets.
The Newark Star Ledger has a daily Union County distribution of 80,760 and a daily statewide distribution of 448,668. Sunday distribution is approximately 50% higher. The Courier News has a daily distribution of 58,350 with 11,921 copies distributed in Union County. The Daily Journal is substantially a Union County newspaper with an in-county circulation of approximately 35,000 out of 36,000 copies. The 1980 census indicates that the population of Union County is 504,094; that 355,548 of its residents are between the ages of 18 and 74; and that there are 177,973 households. It is submitted that 45% of these households would read the Star-Ledger, 5.7% the Courier News and 19-20% the Daily Journal.
*156 From these materials reviewed the court is able to discern that media coverage was not continuous and was remote in its inflammatory aspects. It lacks the potential to destroy the calmness and objectivity required of jurors. Any passions that it may have aroused have had an ample opportunity to dissipate. Lastly, adverse pretrial publicity may be ferreted out by an unabbreviated and searching voir dire examination immediately preceding the trial. For these reasons, closure based on pretrial publicity would be inappropriate and would represent an act of constitutional overbreadth disproportionate to the evidence submitted.
Undoubtedly, public access to judicial proceedings serves several salutory purposes including: (1) fairness and public perception of fairness; (2) public confidence and respect for the judicial system; (3) an outlet for community concern, hostility and emotion; (4) a check on the judicial process, thus discouraging decision based on secret bias or partiality; (5) enhancement of the performance of all involved; and finally, (6) discouragement of perjury and other forms of misconduct. United States v. Criden, 675 F.2d 550 (3 Cir.1982). Thus, the "institutional value" of open pretrial proceedings is significant, constitutionally and educationally, as demonstrated by the test of experience. Yet, we are reminded that in cases involving the death penalty, trial fairness is a categorical imperative. State v. Williams, supra at 61. In this regard New Jersey does not appear to have a unique public attitude. By seeking an accommodation between the constitutional right of public access to criminal pretrial proceedings and the constitutional right of defendant to a fair trial before impartial jurors, this court, with judicial solicitude, has engaged in a balancing test that encompassed an evaluation of existent pretrial publicity against the presumed publicity that would be generated from pretrial hearings three weeks in advance of jury selection. As previously stated, the pretrial publicity was not sustained nor inflammatory and for all intents and purposes remained dormant for several months, reappearing only in response to a case-processing event. Accordingly, *157 this court has determined that this influence, in and of itself, would not create a realistic likelihood of prejudice to a fair trial by an impartial jury. However, the lack of actual prejudice from pretrial publicity is not controlling here since this publicity, when combined with the critical and sensitive issues proffered in camera, would pose a realistic likelihood of prejudice to a fair trial by an impartial jury especially when the time lapse between open pretrial proceedings and jury selection is nonexistent. In State v. Biegenwald, supra, Justice Handler in his dissent sets forth eleven factors a court may consider in determining whether the prejudicial effects of pretrial publicity are sufficient to undermine the right to a fair jury trial. Id. 106 N.J. at 83-84 (Handler, J., dissenting). Each of these factors, either individually or cumulatively weighed and balanced, leads to the inevitable conclusion that there is a substantial probability that defendant's right to a fair trial would be prejudiced if the pretrial media publicity were combined with the media publicity generated from the pretrial proceedings in advance of jury selection. This conclusion is inescapable whether you employ the state or federal standard.
A simple solution exists that permits the court to accommodate the right of public access to pretrial proceedings and, on the other hand, respects defendant's right to a trial by a fair and impartial jury. It necessarily requires the cancellation of the pretrial hearings scheduled to commence on April 27, 1987 and their postponement until after jury selection has been completed. Through that process the constitutional imperatives receive coequal respect. The jury panel, selected but unsworn, shall be insulated from the potentially prejudicial material through meaningful judicial instructions. Hence, at this stage of the proceedings, it is entirely appropriate that this court adopt a procedure that safeguards the trial atmosphere. Accordingly, the pretrial hearings on the in camera proffer of critical issues are adjourned without date with their rescheduling to abide the completion of jury selection, at which time they shall proceed in open court.

*158 Change of Venue.

This court has just determined that the existent pretrial publicity does not require closure of proceedings nor does it offend principles of constitutional dimension. The absence of editorial comment calculated to influence public opinion, as well as random sampling polls, presumptively implies that the summoned prospective jurors shall be fair and impartial. Unlike the "carnival atmosphere" that existed in Sheppard, supra, or the media blitz that preceded jury selection in Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), the specter of presumed prejudice is missing. In a diverse geographical area such as Union County, with approximately one-half million residents, the adverse impact of prior publicity is remote.
It is abundantly clear to this court, as it was to the Biegenwald Court, that the existence of prejudice should not be presumed prior to the jury voir dire. Approximately 17 months have elapsed since defendant was charged with this crime and as stated in Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), "the passage of time can be a highly relevant fact that rebuts any presumption of partiality or prejudice." Id. at 2891.
As noted in both State v. Williams, supra, and State v. Biegenwald, supra, the standard governing the trial court's discretion on a venue-change motion is whether the change is necessary to overcome the realistic likelihood of prejudice resulting from pretrial publicity. Attendant to this standard is the notion that alternative methods should be considered and employed to preserve the integrity of the jury and minimize the danger that prejudice will infiltrate the adjudicatory process. See State v. Williams, supra, 93 N.J. at 63. In capital cases in which a jury must determine whether to impose the sentence of death or life imprisonment upon a guilty defendant, trial courts must exercise special caution in weighing the effects of adverse publicity. Towards that end, the court has already substantially *159 augmented the pool of prospective veniremen. It is currently engaged in the process of determining the granting of additional peremptory challenges, attorney-conducted voir dire, struck jury selection, an exhaustive and searching voir dire, an expansive jury questionnaire, and lastly, a special questionnaire directed toward illiciting any actual prejudice that may have arisen from pretrial publicity. With these various procedures to be employed, the court is satisfied that a venue change, at this posture of the case, is not necessary to overcome the presumed likelihood of prejudice resulting from pretrial publicity. Should jury selection indicate that pretrial publicity has been so pervasive as to necessarily preclude the likelihood of an impartial jury, then this application may be renewed without prejudice to defendant.

The Number of Peremptory Challenges.
With the reenactment of the death penalty in 1982, N.J.S.A. 2C:11-3, matters pertinent to a voir dire examination in regard to jurors' views on capital punishment reacquire a certain significance that dissipated when State v. Funicello, 60 N.J. 60 (1972) cert. den. sub nom. New Jersey v. Presha, 408 U.S. 942, 92 S.Ct. 2849, 33 L.Ed.2d 766 (1972), effectively eliminated the death penalty. One of those areas of significance deals with the court's discretionary authority to increase proportionally the number of peremptory challenges available to defendant and the State in any capital case.
R. 1:8-3(d), in its relevant part provides:
The trial judge shall have discretionary authority to increase proportionally the number of peremptory challenges available to the defendant and the State in any case in which sentencing procedure set forth in subsection c. of N.J.S.A. 2C:11-3 might be utilized.
The State, by its filing of aggravating factors, has indicated that it seeks the death penalty. Should a sentencing proceeding be necessary, the jury will have the responsibility of determining the penalty to be applied for each murder that has occurred. With that legal gauntlet in mind, it is neither burdensome *160 nor inappropriate to proportionally increase the number of peremptory challenges especially in view of the court's decision to impanel 16 jurors who will have been death qualified.
At present, R. 1:8-3(d) provides 20 peremptory challenges to defendant and 12 peremptory challenges to the State. Defendant's number of allotted peremptory challenges exceeds those of the State by 40%. An increase of five challenges to defendant and three challenges to the State will maintain the proportion, unlike the proportional difference that would result from an increase of four to defendant and two for the State.
Accordingly, defendant shall be allotted 25 peremptory challenges and the State 15 peremptory challenges during jury selection.

Counsel Voir Dire Participation.
Kindred to the number of peremptory challenges allotted to the parties is the ever-burning issue of attorney-conducted voir dire. It has received more than academic attention throughout the years, and the arguments pro and con are as diverse as the individuals who advocate their considered positions.
In State v. Manley, 54 N.J. 259 (1969), Justice Francis observed:
On many instances it has taken as long or longer to impanel a jury as to try the case. The impression is inescapable that the aim of counsel is no longer exclusion of unfit or partial or biased jurors. It has become the selection of a jury as favorable to the party's point as indoctrination through the medium of questions on assumed facts and rules of law can accomplish. [at 281-283]
Thus, Manly marked a departure from the prior practice of attorney-conducted voir dire. Among the reasons attributed to the discontinuance of attorney-conducted voir dire were great savings of time and the improved quality of the examination. Lengthy and prolix examinations were in strong disfavor and eminent jurists such as Learned Hand opined that "it had become a scandal and required some effective control." Falter *161 v. United States, 23 F.2d 420, 426 (2 Cir.1928). Opponents of a Manley styled rule disagree that a judge-conducted voir dire will more likely produce a truly impartial jury. They assert that due to the imposing figure of the judge sitting on an elevated bench garbed in a black robe, a juror will respond differently to sensitive questions posed by a judge than to questions posed by counsel. No definitive data supporting counsel conducted voir dire has been observed by this court nor has this court's experience in the impaneling of two death qualified juries provided substance to this assertion. Moreover, Manley, supra, though clearly outlining the procedure to be followed in the conduct of voir dire, did not foreclose supplementary questioning by counsel entirely, but left control over its scope and content to the experienced judgment and discretion of the trial judge. Manley, supra at 282.
In addition to R. 1:8-3(a) wherein the parties or their attorneys may supplement the court's interrogation in its discretion, our Supreme Court in State v. Biegenwald, supra, revisited the Manley issue and determined that "Manley was intended to apply, and should apply in death penalty cases." Id. 106 N.J. at 29. It further reaffirmed the purpose of the predecessor to R. 1:8-3(a) which was to return control of the voir dire to the trial court. Nevertheless, it did not disapprove additional personal questioning by counsel nor did it close the door that Justice Francis left open in Manley. In point of fact, it endorsed, if not encouraged, some participation by counsel in capital cases where life is forfeit when it noted that "trial courts should be especially sensitive to permitting attorneys to conduct some voir dire." Biegenwald, supra at 30.
While some courts may be impressed with their ability to attenuate the number of days involved in a death qualification voir dire of a jury panel, this court is not. Though it respects the saving of time and recognizes that the impaneling of the jury may necessarily exceed the time required to try the case, these arguments pale in significance where life is at stake. No apology need ever be made for judicial vigilance especially in a *162 case such as this where community outrage, as in Biegenwald, presents the greatest challenge to the fairness, impartiality and integrity of our judicial system. State v. Beigenwald, supra at 107 (Handler, J., dissenting).
During the jury selection process, personal attorney-conducted voir dire supplementary to that of the court shall be permitted when necessary and, in the court's opinion, required to ferret out a bias or prejudice that presumably may have escaped the court. It should not be an ordinary procedure but rather an extraordinary one. This conclusion is not arrived at easily. Misuse of attorney-conducted voir dire has not escaped this court's experience. What impels this court toward this determination is the nature and circumstances of the offenses charged as well as this court's familiarity with the professionalism of involved counsel and its respect for their judgment not to abuse the trust and confidence reposed in them by the grant of this permission. Where counsel conveys the need to personally examine a prospective venireman such right of first examination shall alternate between the State and defendant.

Struck Jury.
The remaining component of the voir dire trilogy to be resolved is whether to proceed by the so-called "Arizona" or struck-jury system. Any doubts that may have existed regarding its status as a constitutional right was negated in State v. Ramseur, supra 106 N.J. at 240.
Previously, this court entered an order directing that this case proceed by "struck jury." The method of jury selection, as well as the manner in which peremptory challenges are exercised, is left to the sound discretion of the court, limited only by defendant's right to a fair and impartial trial. Needless to say, the proponents and opponents of a "struck jury" system each raise meritorious arguments as to its favor or disfavor.
Quite candidly, the court, in regard to this issue, not unlike other issues decided today, is more concerned with the substance *163 of its decision than the procedure to be employed. In seeking to balance the exigencies of the judicial system with the interests of the parties in exercising informed peremptory challenges, the court is satisfied that implementation of the "struck jury" system in this particular case involving multiple homicides will serve to advance the ends of justice. While, admittedly, the questioning and qualifying of 56 jurors may be somewhat burdensome, this court cannot say that its role in the selection process will be unduly burdened when weighed against the emotional and legal issues to be advanced at time of trial. By this determination, as well as those pertaining to the addition of peremptory challenges and attorney-conducted voir dire, this court recognizes and is protective of defendant's significant jury rights in light of the importance of the interest at stake. State v. Biegenwald, supra, 106 N.J. at 82 (Handler, J., dissenting). These decisions satisfy the consistency and reliability in the administration of capital punishment as required by Art. I, par. 12 of the New Jersey Constitution.
Admittedly, the State and defendant are entitled to a fair and impartial jury. The right of peremptory challenge is one of exclusion, not selection. State v. Ramseur, supra 106 N.J. at 243. Since the manner in which the peremptory challenges are exercised is reposed within the discretion of the court, and with full recognition of the proportional disparity that exists between statutory and court-allotted peremptory challenges, defendant shall exercise two peremptory challenges for every peremptory challenge exercised by the State.[1] Through this *164 method of challenge, equality in the number of remaining challenges will occur in the eleventh round of challenge, each party retaining five potential peremptory challenges. This method of exercise appears to comport with fundamental fairness to all concerned parties.

Conclusion.
In summary, this court has decided that pretrial publicity does not mandate closure; that a hearing of the critical issues proffered in camera immediately preceding trial would imperil this court's ability to select a fair and impartial jury in Union County unless that proceeding was adjourned until after jury selection is completed; that additional peremptory challenges will be granted along with the right of counsel to supplement the court's inquiry by personally examining prospective jurors; and lastly, that the "struck jury" system will be employed during which the defense shall issue two peremptory challenges for each challenge exercised by the State or until the remaining challenges are equal in number.
Defendant is hereby directed to prepare an order setting forth the matters decided by this opinion.
NOTES
[1] This court is aware of State v. Brunson, 101 N.J. 132 (1985) and particularly its admonition:

We are nevertheless impressed by the desirability of a standardized procedure for the implementation of the exercise of peremptory challenges in criminal cases. Accordingly, we will solicit the recommendation of our Criminal Practice Committee as to the establishment by Court Rule of a procedure governing the exercise of peremptory challenges. In the interim, to maintain uniformity trial courts should refrain from using peremptory challenges procedures that differ from the customary, one-for-one, alternating method. [at 145]
Brunson was decided December 12, 1985. The most recent Criminal Practice Committee report dated May 1987 in its pertinent part states, "In single defendant cases, where there was an unequal number of peremptory challenges or in multi-defendant cases, the rule amendment would provide that the order of exercise would be established by the Court." Emphasis supplied.