**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1756-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DALIA D. FIGUEROA,

    Defendant-Appellant.

_____

Argued October 21, 2025 – Decided December 17, 2025

Before Judges Gilson, Firko, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 16-04-0058.

Samuel Carrigan, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Samuel Carrigan, of counsel and on the briefs).

Regina M. Oberholzer, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Regina M. Oberholzer, of counsel and on the brief).

PER CURIAM

Defendant Dalia Figueroa was convicted of five crimes related to her intent to distribute a large quantity of phencyclidine (PCP), which is a controlled dangerous substance (CDS). She was sentenced to serve thirteen years in prison. Defendant appeals challenging her convictions and sentence. Having reviewed her arguments in light of the record and law, we reject her contentions and affirm.

## I.

In July 2013, the New Jersey State Police (NJSP) received a tip from a confidential informant that a package addressed to Jennifer Ball was scheduled to be delivered on July 3, 2013, to an address in Camden. After receiving the tip, Detective Sergeant Garrett Cullen of the NJSP searched police databases and determined there was no record of Jennifer Ball living at that address. Based on the tip and the presumably fictitious addressee, the NJSP decided to surveil the property on July 3.

Cullen testified that at approximately 10:30 a.m., a United Parcel Service (UPS) driver approached the front door with a package, knocked, and handed the package to a woman. The woman was later identified as Tracy Murphy. Cullen and his team continued to watch the house for several hours to see if anyone else came to get the package. At approximately 1:30 p.m., Cullen and

2

another detective approached the residence and knocked on the front door.  The package's recipient, Murphy, opened the door.  The detectives explained their presence and Murphy invited them into the house.  After the detectives read Murphy her Miranda[1] rights, she decided to cooperate with the police investigation.  Murphy claimed that the package was not hers and she was holding it for someone else, with whom she communicated by text messages.  She then consented to a search of the package and a review of the text messages on her cell phone.

The detectives opened the package and saw it contained a smaller box, which held two paint cans.  When the detectives removed the paint cans from the box, they heard liquid inside, which they believed was PCP based on its distinctive odor.

A review of Murphy's cell phone disclosed text messages between Murphy and a person listed as "Dalia."  The messages discussed the arrival of a "cousin," and Murphy explained that "cousin" was a word they used for the package.  Shortly after the package had been delivered, Murphy had texted Dalia telling her that her "cousin" had arrived.  Dalia responded that she would pick up her cousin after work.

---

[1]  Miranda v. Arizona, 384 U.S. 436 (1966).

The detectives decided to wait for Dalia to come to the house. So, they resealed the package and left it on the kitchen table. They then hid in a bathroom from which they could see the kitchen.

Just after 2:00 p.m. defendant arrived at Murphy's home. She came into the kitchen, picked up the package, and turned to leave. Cullen then emerged and detained defendant. After waiving her Miranda rights, defendant claimed that the contents of the box did not belong to her, and she was picking it up for a contact named Jimmy who lived in Philadelphia.

Defendant offered to call Jimmy while the officers listened, but she needed to get her cell phone from her car. She was escorted to her car by Sergeant Ricardo Diaz of the NJSP. When they got to the car, Diaz observed a vial of PCP sitting on the car's center console and seized it. Defendant then returned inside, called Jimmy, and told him that her car had broken down, and he would have to come to Camden to retrieve the package. Jimmy never arrived. Murphy and defendant were then arrested. As part of their investigation, detectives had determined that Murphy's house was within 1,000 feet of a school and 500 feet of a public park.

In April 2016, a grand jury returned an indictment charging defendant with five counts: first-degree possession with intent to distribute more than ten

4

grams of PCP in violation of N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(6) (count one); second-degree conspiracy to distribute more than ten grams of PCP in violation of N.J.S.A. 2C:5-2 (count two); third-degree possession with intent to distribute PCP, a CDS, within 1,000 feet of school property, in violation of N.J.S.A. 2C:35-7(a) (count three); second-degree possession with intent to distribute PCP within 500 feet of certain public property, in violation of N.J.S.A. 2C:35-7.1(a) (count four); and second-degree possession with intent to distribute PCP in violation of N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(7) (count five). Co-defendant Murphy was charged with counts one through four but not count five.

Several months later, Murphy pled guilty to third-degree possession with intent to distribute PCP within 1,000 feet of school property. Murphy was sentenced to three years of probation, and she agreed to testify at defendant's trial.

Defendant moved to suppress the PCP. Following an evidentiary hearing, the trial court denied that motion.

A jury trial was conducted in August 2018. During that trial, both Murphy and defendant testified. In her testimony, Murphy admitted to participating in a scheme with defendant to ship drugs to New Jersey. She described a series of

text messages she sent to and received from defendant and explained how she and defendant coordinated the arrival of a package, which they referenced as "cousin."

Murphy also testified about her interactions with the NJSP detectives on July 3, 2013, stating that they knocked at her door and she invited them in. Murphy confirmed that she consented to a search of the package, and that she voluntarily cooperated with the detectives' investigation. She also described how defendant retrieved the package, stating that defendant came in the back door, they spoke briefly, defendant picked up the package, and the detectives then detained defendant.

Defendant testified in her own defense during the first trial. She claimed that Murphy was her PCP dealer and had sold defendant $50 of PCP on several occasions. She further stated that when she entered Murphy's home on the day she was arrested, it was Murphy who put the box into her hands and then the officers emerged to detain her. Defendant conceded that the vial of PCP found in the car belonged to her and asserted it was for personal use.

The jury also heard testimony from Mandelle Hunter, a forensic scientist at an NJSP laboratory, who was qualified as an expert witness in forensic chemistry. Hunter explained that just one of the paint cans was tested, the

6

contents tested positive for PCP, and the can contained 841.6 grams of liquid. She then pointed out that the threshold weight for a first-degree offense was ten grams of PCP. Hunter also stated that in her expert opinion the vial from defendant's car was 9.07 grams of liquid PCP. A separate expert testified that the total street value of the PCP in the one can was approximately $1.6 million.

After hearing the testimony and considering the evidence, the jury found defendant guilty of count five but failed to reach a verdict on the remaining counts. The trial court thereafter declared a mistrial on counts one through four.

Defendant was then tried a second time in September and October 2019. During voir dire, as part of the jury selection for the second trial, the court asked potential jurors, "[w]ould you give greater, less, or equal weight to a cooperating witness who is receiving a benefit from the State for their testimony?" Five potential jurors indicated that they would give less weight to the testimony. The State moved to exclude those jurors for cause, defense counsel objected, and the trial court dismissed the potential jurors for cause. The trial court also dismissed two other potential jurors who stated they would give greater weight to testimony from a witness who is receiving a benefit from the State.

Murphy's testimony at the second trial was substantially similar to her testimony during the first. Cullen once again testified regarding the NJSP's

A-1756-22

investigation, and his testimony closely mirrored what he explained at the first trial. Defendant elected not to testify at the second trial. The jury instead heard parts of defendant's previous testimony through a recording. In the second trial the State and defendant stipulated that the paint can from the package was tested by a state employed chemist. Accordingly, Hunter did not testify at the second trial, but her lab reports regarding the contents of the paint can were explained to the jury by Cullen.

The second jury convicted defendant of counts one through four. Thereafter, defendant moved for a new trial. She contended, among other things, that the jury was not impartial because the court had excused five potential jurors for cause, who indicated they would give lesser weight to testimony from a witness who was receiving a benefit from the State.

A different judge heard that motion and denied it. The motion judge reasoned that the trial judge had erred because he did not ask follow-up questions to determine if those individuals could still fairly evaluate the testimony. The motion judge, however, determined that the error was harmless, because the State still had sufficient peremptory challenges to strike the challenged individuals. In that regard, the motion judge reasoned that the jury would not have changed because, even if the trial judge had denied the for-cause

8

dismissals, the State could have exercised its peremptory challenges to excuse those same five individuals.

Thereafter, defendant was sentenced. On the conviction for count one, first-degree possession with intent to distribute more than ten grams of PCP, defendant was sentenced to thirteen years in prison. The convictions for counts two and five were merged into count one. The conviction for count three was merged into count four, and on count four defendant was sentenced to a concurrent prison term of five years. Thus, in total, defendant was sentenced to thirteen years in prison.

Defendant now appeals from her convictions and sentence.

## II.

On appeal, defendant presents four arguments for our consideration, which she articulates as follows:

> POINT I – THE ERROR IN THE SECOND TRIAL'S JURY SELECTION—DISMISSING FOR CAUSE THOSE JURORS WHO RESPONDED TO A CONFUSING QUESTION THAT THEY MAY GIVE LESS WEIGHT TO A COOPERATING STATE WITNESS RECEIVING A BENEFIT FOR THEIR TESTIMONY—WAS NOT HARMLESS.
>
> A. The voir dire question was problematic because it was both imbalanced and confusing.
>
> B. The for-cause removals were error.

C.     The error was not harmless.

POINT II – THE PACKAGE SHOULD HAVE BEEN SUPPRESSED BECAUSE THE OFFICERS HAD NO REASONABLE BASIS TO RELY ON THIRD-PARTY CONSENT FOR A WARRANTLESS SEARCH WHEN THE CO-DEFENDANT DENIED OWNERSHIP OF THE PACKAGE.

POINT III – IT WAS ERROR TO PROHIBIT THE DEFENSE FROM INTRODUCING EVIDENCE THAT THE STATE'S COOPERATING WITNESS HAD PRIOR DRUG DISTRIBUTION CHARGES, IN CONTRADICTION OF HER SWORN TESTIMONY.

POINT IV – DEFENDANT'S THIRTEEN YEAR SENTENCE IS EXCESSIVE.

A.     The court's finding of aggravating factor five, "a substantial likelihood that the defendant is involved in organized criminal activity," was not supported by the record.

B.     The mitigating factors substantially outweighed the aggravating factors, and the interests of justice supported a downgrade.

C.     The excessive sentence imposed does not reflect the stated goals of sentencing outlined in the Criminal Code.

A.  The Jury Voir Dire.

Defendant first argues that the trial court erred in denying her motion for a new trial.  She contends that she was denied a fair and impartial jury because

the trial court dismissed five potential jurors for cause when they indicated that they might give less weight to a witness who was receiving a benefit from the State for testifying. Defendant also argues that the dismissal of those five individuals was not harmless.

Criminal defendants have the "constitutional right to be fairly tried by an impartial jury." State v. Williams, 93 N.J. 39, 61 (1983). That right is "rooted in both the Sixth Amendment of the federal [C]onstitution and Art. I, par. 10 of the State Constitution." Ibid. Trial courts have a duty "to take all appropriate measures to ensure the fair and proper administration of a criminal trial," and that duty begins with a proper voir dire. State v. Fortin, 178 N.J. 540, 575 (2004) (quoting Williams, 93 N.J. at 62). "A 'vital aspect' of that responsibility is to ensure the impaneling of only impartial jurors by ferreting out potential and latent juror biases." Ibid. (quoting Williams, 93 N.J. at 62-63).

Appellate courts "review the trial court's conduct of voir dire at defendant's trial in accordance with a deferential standard. '[A] trial court's decisions regarding voir dire are not to be disturbed on appeal, except to correct an error that undermines the selection of an impartial jury.'" State v. Little, 246 N.J. 402, 413 (2021) (alteration in original) (quoting State v. Winder, 200 N.J. 231, 252 (2009)). A "court's exercise of discretion in dealing with requests for

A-1756-22

specific inquiries of prospective jurors in the voir dire examination is subject to reversal only on a showing of prejudice in that the voir dire examination failed to afford the parties an opportunity to select an impartial and unbiased jury." Id. at 413-14 (quoting Pressler & Verniero, Current N.J. Court Rules, cmt. 1.2 on R. 1:8-3 (2021)). While inquiries should be designed to detect bias, acceptable voir dire questions should be distinguished from "inquir[ies] that may improperly indoctrinate jurors as to the outcome they should reach in a given case." Id. at 414.

Prior to the start of the jury selection for defendant's second trial, the State submitted two supplemental voir dire questions: "Would you give greater, less, or equal weight to a cooperating witness who is receiving a benefit from the State for their testimony?" and "[h]ave you known anyone who has had a serious problem as a result of drug use?" Defense counsel objected to the second question but stated that he had no objection "to the question about cooperating witnesses."

During the jury selection, five jurors stated that they would give less weight to the testimony of a cooperating witness who is receiving a benefit for their testimony. Neither the trial court nor counsel asked or requested any follow up inquiries concerning those responses to the question. Instead, each

12

time the State moved to dismiss the prospective juror for cause. Defense counsel objected, but each time the court overruled the objection and dismissed those five prospective jurors for cause.

The primary question presented to us is whether the for-cause dismissals of those five potential jurors resulted in an impartial jury. The questioning of each of the prospective jurors concerning their responses to the jury questionnaire took place at sidebar. Accordingly, the other potential jurors did not hear why the five prospective jurors were dismissed.

More to the point, there is no evidence that the jury selected was partial. The jurors who were selected were all asked the standard and supplemental questions, including the question of whether they would give greater, less, or equal weight to a cooperating witness who was receiving a benefit from the State for her testimony. Furthermore, in instructing the jury, the trial court gave the model jury charge concerning testimony of a cooperating co-defendant or witness. See Model Jury Charges (Criminal), "Testimony of a Cooperating Co-Defendant or Witness," at 1-2 (rev. Feb. 6, 2006). Thus, the jury was told that it may consider Murphy's plea of guilty, as well as whether she had "a special interest in the outcome of the case and . . . [an] expectation of any favorable treatment . . . ." Indeed, the record demonstrates that the jury which was selected

13

was impartial. In that regard, after the jury was impaneled, defense counsel stated that the jury was acceptable.

In addition, we point out that defendant made this argument as part of a motion for a new trial. "[A] motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown." State v. Armour, 446 N.J. Super. 295, 306 (App. Div. 2016) (alteration in original) (quoting State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000)). "The trial court's ruling on such a motion shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law." State v. Perez, 177 N.J. 540, 555 (2003) (quoting R. 2:10-1).

In this matter, we discern no abuse of discretion or miscarriage of justice because, as we have pointed out, there is no evidence the jury that heard and decided this matter was partial or biased. We note that while the five prospective jurors who answered they would give less weight to the testimony were dismissed, two other prospective jurors who answered that they would give greater weight were also dismissed for cause. Those two dismissals were made on the application of defendant. The material point, however, is that the for-cause dismissals of those seven prospective jurors did not taint the jury that was

14

selected and there has been no showing the selected jury was anything other than fair and impartial.

As part of her challenge to the for-cause dismissals of the five prospective jurors, defendant argues that the question itself "was problematic because it was both imbalanced and confusing." Because defendant did not object to the question at trial, we review this issue for plain error. State v. Singh, 245 N.J. 1, 13 (2021) (citing R. 2:10-2). We discern no plain error.

The question itself was not worded in a way that would indoctrinate jurors as to the outcome they should reach in the case. Indeed, the question appears to have been modeled on the standard jury question concerning testimony from law enforcement officers. That standard question asks: "Would any of you give greater or lesser weight to the testimony of a police officer merely because of his or her status as a police officer?" Admin. Off. of the Cts., Admin. Directive #4-07, Jury Selection – Model Voir Dire Questions Promulgated by Directive #21-06 attach. at 4 (May 16, 2007) (Model Criminal Jury Voir Dire Questions). The trial judge should have asked follow-up questions of the five prospective jurors to determine if they could be fair and impartial and whether they would evaluate Murphy's testimony consistent with the court's instructions. The failure

to conduct those follow up questions, however, did not taint the other prospective jurors or the jurors who were selected.

In contending that the jury question was imbalanced and confusing, defendant relies on State v. Little. In Little, the challenged jury question told prospective jurors that the State was not required to produce the gun and asked if the failure to do so would affect their ability as a juror. 246 N.J. at 409, 411. The New Jersey Supreme Court held the question was improperly suggestive. Id. at 419. The question in Little, however, is distinguishable from the question asked in this matter. As already noted, the question asked in this matter was not improperly suggestive. To the extent that there was any shortcoming, it was limited to the trial court's failure to ask follow-up questions.

Defendant also argues that the for-cause dismissals were errors, and the errors were not harmless. Having reviewed the voir dire transcripts, we discern no reversible errors in the dismissal of the five prospective jurors.

Moreover, any errors that may have occurred were harmless. Issues that arise during jury selection are subject to harmless error analysis. State v. W.A., 184 N.J. 45, 64 (2005). Under that analysis "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been

clearly capable of producing an unjust result . . . ." Id. at 66 (quoting R. 2:10-2).

Defendant was not entitled to retain the five prospective jurors who were dismissed because there is no showing that dismissing those five prospective jurors created an imbalanced jury that was not reflective of the community from which the jury pool was drawn. Again, defendant was entitled to an impartial jury, and she has made no showing that the jury was anything but fair and impartial.

In summary, having reviewed the jury voir dire in this case, we discern no error that undermined the selection of an impartial jury. See Little, 246 N.J. at 413 (quoting Winder, 200 N.J. at 252) (explaining that a trial court's decisions during voir dire should not be disturbed "except to correct an error that undermines the selection of an impartial jury").

B.    Murphy's Consent to Search the Package.

Next, defendant argues that the trial court erred in denying her motion to suppress the contents of the package. She contends Murphy informed the detectives that she did not own the package and, therefore, she could not give a valid consent to search the package.

17

Appellate courts review a trial court's determination on a motion to suppress under a deferential standard. State v. Miranda, 253 N.J. 461, 474 (2023). Appellate courts "must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." Ibid. (quoting State v. Nyema, 249 N.J. 509, 526 (2022)) (internal quotation marks omitted). Appellate courts, however, review trial courts' legal conclusions de novo. Id. at 475.

Generally, searches by governmental officials require a warrant. Ibid. (citing State v. Wright, 221 N.J. 456, 466 (2015)). When law enforcement personnel conduct a warrantless search, the State bears the burden of proving one of the exceptions to the warrant requirement justified the search. Ibid. (citing State v. Cushing, 226 N.J. 187, 199 (2016)). "[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Id. at 475-76 (alteration in original) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)).

Searches are constitutional so long as the consenting individual had the "apparent authority" to consent to the search. Id. at 476 (quoting Cushing, 226 N.J. at 199). In determining apparent authority, a court must evaluate "whether the officer's belief that the third party had the authority to consent was

objectively reasonable in view of the facts and circumstances known at the time of the search." State v. Coles, 218 N.J. 322, 340 (2014) (quoting State v. Suazo, 133 N.J. 315, 320 (1993)).  Apparent authority analyzes concepts like ownership of the property, rights to use and possess the property, and the relationship between the consenter and the defendant.  Cushing, 226 N.J. at 197-200.

The trial court conducted an evidentiary hearing on defendant's motion to suppress the contents of the package.  At that hearing, the court heard testimony from Cullen.  Cullen explained how he had observed the package delivered to Murphy's home and that she had accepted the package.  He then detailed how he approached the home, that Murphy informed him she did not know of a person named Jennifer Ball, and she had received the package and was holding it for a friend named Dalia.  Cullen continued to explain that when he asked Murphy about the package, she retrieved it and offered to let the officers search the package.  Cullen then presented Murphy with a consent form, which she reviewed and signed.

Before opening the package, Cullen asked Murphy what was in the package, and she told him that she believed it contained drugs.  Cullen then opened the package and eventually found two paint cans that contained a liquid, which he believed was PCP.

Based on that testimony, the trial court found Murphy had given a valid consent and that she had the authority to allow the search. In that regard, the trial court found Murphy was the owner of the residence where the package was delivered and she had control over the package when she provided consent.

The trial court's findings are supported by substantial credible evidence. Moreover, those findings support the legal conclusion that Murphy provided valid consent. When Murphy gave her consent, the package had been delivered to her home, and she was in possession of the package. It was also clear that the addressee of the package was fictitious. Thus, at that point in time, Murphy was the person with possession and control of the package, and it was reasonable for the officers to rely on her consent.

Given our affirmance on that basis, we need not address the State's alternative ground that defendant lacked standing to challenge the search of the package.

C.    Murphy's Prior Conviction.

At her first trial, defendant sought to impeach Murphy by confronting her with a 1994 conviction from California for possession with intent to distribute marijuana. Murphy had been sentenced to probation for that California

20

conviction. The trial court denied that request, finding that the prior conviction was too remote.

At her second trial, defendant filed a motion under N.J.R.E. 404(b) seeking to admit Murphy's 1994 conviction again for the purposes of impeaching Murphy. That motion was denied. Defendant now argues that those rulings were errors that warrant reversal of her convictions. We are not persuaded by that argument.

"Courts have a gatekeeping role to ensure that unreliable, misleading evidence is not admitted." State v. Chen, 208 N.J. 307, 318 (2011). On appellate review, a trial court's evidentiary rulings will be upheld unless there is "a showing of an abuse of discretion." State v. Williams, 240 N.J. 225, 234 (2019) (quoting State v. Scott, 229 N.J. 469, 479 (2017)).

N.J.R.E. 609 governs the admissibility of prior convictions for impeachment purposes. If more than ten years has passed since the conviction or the person's release from confinement, "the conviction is admissible only if the court determines that its probative value outweighs its prejudicial effect, with the proponent of that evidence having the burden of proof." N.J.R.E. 609(b)(1). Subsection (b) of the Rule goes on to explain:

(2) In determining whether the evidence of a conviction is admissible under subparagraph (b)(1) of this rule, the court may consider:

      (i) whether there are intervening convictions for crimes or offenses, and if so, the number, nature, and seriousness of those crimes or offenses,

      (ii) whether the conviction involved a crime of dishonesty, lack of veracity or fraud,

      (iii) how remote the conviction is in time,

      (iv) the seriousness of the crime.

[N.J.R.E. 609(b)(2).]

Under a reverse Rule 404(b) motion, "[a] defendant generally may introduce 'similar other-crimes evidence defensively if in reason it tends, alone or with other evidence, to negate his [or her] guilt.'" State v. Weaver, 219 N.J. 131, 150 (2014) (quoting State v. Garfole, 76 N.J. 445, 453 (1978)). Where the use of similar other-crimes evidence is proposed by a defendant, admissibility is determined by the proposed evidence's relevancy to the guilt or innocence of the defendant. Ibid. (quoting Garfole, 76 N.J. at 452-53).

Here, we discern no abuse of discretion in the trial court's decisions to exclude the use of Murphy's prior conviction from California. When Murphy first testified, more than twenty-three years had passed since her conviction in 1994. The trial court appropriately reasoned that the conviction was remote,

22

there were no intervening convictions, and the 1994 conviction did not involve a crime of dishonesty, lack of veracity, or fraud.

The second trial judge applied similar reasoning in denying the Rule 404(b) motion. The judge pointed out that the underlying facts of Murphy's prior conviction were unknown, and California law may differ from New Jersey law. The second judge also found that because Murphy's California conviction from 1994 was remote, the underlying facts were unknown, and California's law may differ, her conviction was not relevant to defendant's trial. We see no abuse of discretion in those determinations.

On appeal, defendant argues the prior conviction should have been admissible because it could have impeached Murphy when she testified that she never distributed PCP. We discern no reversible error because the jury was already aware that Murphy had pled guilty to possession with intent to distribute the PCP in this case. Consequently, the twenty-three-year-old conviction from California was not probative of defendant's guilt or innocence.

D.    The Sentence.

Finally, defendant argues that her thirteen-year prison sentence was excessive. An appellate court's standard of review of a sentence is well-established and deferential. State v. Cuff, 239 N.J. 321, 347 (2019) (quoting

A-1756-22

State v. Fuentes, 217 N.J. 57, 70 (2014)).  We will affirm a trial court's sentence unless:  "(1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'"  State v. Bolvito, 217 N.J. 221, 228 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

In challenging her sentence, defendant makes three arguments.  First, she asserts the trial court erred in finding aggravating factor five, which required evidence showing a substantial likelihood that defendant had been involved in organized criminal activity.  Second, she contends the mitigating factors substantially outweighed the aggravating factors, and the interest of justice supported the downgrade of her sentence so that she would be sentenced in the second-degree range as opposed to the first-degree range.  Lastly, she asserts that her sentence did not reflect the goals outlined in the Code of Criminal Justice.

In sentencing defendant, the trial court found aggravating and mitigating factors.  In terms of aggravating factors, the court found factor five, that

24                                                                    A-1756-22

defendant was involved in organized criminal activity, N.J.S.A. 2C:44-1(a)(5); and aggravating factor nine, the need for deterrence, N.J.S.A. 2C:44-1(a)(9).

The court also found mitigating factors seven, that defendant otherwise was a law-abiding person, N.J.S.A. 2C:44-1(b)(7); eight, that the circumstances were unlikely to reoccur, N.J.S.A. 2C:44-1(b)(8); nine, that defendant was unlikely to reoffend, N.J.S.A. 2C:44-1(b)(9); and eleven, that prison would be a hardship to defendant and her dependents, N.J.S.A. 2C:44-1(b)(11).

The sentencing court then found that the mitigating factors slightly outweighed the aggravating factors, but they did not substantially outweigh those factors. Therefore, the court determined that a downgraded sentence was not warranted.

We discern no reversible error in the trial court's finding of aggravating factor five. There was substantial evidence showing that defendant had been involved in organized criminal activity. Defendant was convicted of first-degree possession with intent to distribute more than ten grams of PCP. Indeed, there was testimony that the street value of just one of the cans containing the PCP had a value of approximately $1.6 million. The sentencing court found that defendant was part of a chain in a multi-state CDS smuggling and distribution operation. That finding is supported by the package, which was sent from

25

California to New Jersey and addressed to a person who did not actually live at the address. Defendant herself admitted that she was then going to turn the package over to someone who was based in Philadelphia. The evidence also showed that Murphy and defendant used the code word—cousin—to conceal their activities. Those facts, taken together, amply support that defendant was involved in an organized distribution of narcotics.

The sentencing court's determination that the mitigating factors did not substantially outweigh the aggravating factors is also supported by the record. Under N.J.S.A. 2C:44-1(f)(2), a sentencing court can downgrade a first- or second-degree crime to a crime of one degree lower provided the court is (1) "clearly convinced that the mitigating factors substantially outweigh the aggravating factors;" and (2) "the interest of justice demands" a reduction in the sentence. The New Jersey Supreme Court has explained that the standard for downgrading a sentence is "high." State v. Megargel, 143 N.J. 484, 500 (1996). To satisfy the "interest of justice" requirement, a defendant must present "compelling" reasons for the downgrade. Id. at 505.

Defendant has pointed to no facts demonstrating that the sentencing court abused its discretion in rejecting her argument to downgrade her sentence. As already pointed out, the street value of just one can of the PCP that defendant

26

was found to be intending to distribute, was approximately $1.6 million. Consequently, a sentence in the low range of the first-degree sentencing range was not an abuse of discretion.

Nor has defendant presented any facts showing that her sentence was inconsistent with the goals of the Criminal Code. The "paramount" goal of the Code of Criminal Justice "is to eliminate arbitrary and idiosyncratic sentencing so that similarly situated defendants receive comparable sentences." State v. Case, 220 N.J. 49, 63 (2014) (citing State v. Natale, 184 N.J. 458, 485 (2005)). "To achieve that end, the Code has established a framework of structured discretion within which judges exercise their sentencing authority." Ibid. (citing Natale, 184 N.J. at 485). The structure is set up by the degree of crime, as established by the Legislature. Ibid. Judges "generally exercise their discretion within the given range" and depart from those given ranges in "specifically defined circumstances." Id. at 63-64 (citing Roth, 95 N.J. at 359).

A review of the sentence imposed on defendant convinces us that the sentencing court complied with both the specific sections of the Code of Criminal Justice and its spirit. Accordingly, we discern no grounds for reversing or modifying defendant's sentence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

27